[No. A015564. First Dist., Div. Two. June 10, 1985.]

BERT G. GIANELLI DISTRIBUTING CO. et al., Plaintiffs and Appellants, v.
BECK & CO. et al., Defendants and Respondents.

1024

**1030**

───

**COUNSEL**

Timothy H. Fine and Patrick J. Carter for Plaintiffs and Appellants.

Lionel T. Aiken, Jeffrey P. Mansuy and Aiken & Mansuy for Defendants and Respondents.

───

**OPINION**

**KLINE, P. J.—**

### Introduction

Plaintiffs are eight local beer wholesalers terminated as distributors for defendant Beck & Co. They appeal from a judgment in favor of defendants entered after defendants' motion for summary judgment was granted. Plaintiffs challenge the grant of summary judgment on each of the three causes of action charged by each plaintiff. Specifically, they contend: (1) plaintiffs presented sufficient evidence to create a question of fact as to whether the contract between Beck & Co. and each plaintiff included an implied requirement of good cause for termination; (2) sufficient evidence presented an issue of material fact as to whether defendants entered into a combination in restraint of trade adversely affecting industry competition; (3) since their hearsay evidence was admissible under the coconspirator exception to the hearsay rule, sufficient evidence supported a material question of fact as to whether defendants tortiously interfered with prospective business relations between plaintiffs and the "direct" or "master" wholesalers from whom they had previously purchased their Beck's Beer.

In addition, plaintiff Rausser contends that: (1) its termination constituted an additional violation of the Cartwright Act's prohibition of exclusive dealing contracts which may substantially lessen competition, and (2) it offered sufficient separate, admissible evidence to support a triable issue of fact as

to whether defendants tortiously interfered with its business relations with independent third parties.

*Statement of Facts*[1]

Beck & Co. is a beer manufacturer based in West Germany; its product, Beck's Beer, is imported into the United States by Dribeck Importers. There is some conflict in defendants' evidence as to defendant Jack Woodlief's position with Beck & Co.: His answer to the complaint and one declaration states that he is western U.S. sales director for Beck's Beer; for purposes of a motion to quash service of summons his declaration stated he was not an employee of Beck & Co. Defendant Jack Lewis is regional sales manager for Beck's Beer, working under the supervision of Jack Woodlief.

There is also some conflict in the parties' descriptions of the distribution network for Beck's Beer, and the relationships between the parties. Defendants characterize the distribution network as a "three-tier system," with the first tier being the brewer/manufacturer, the second the wholesaler/distributors, and the third the retailers. Plaintiffs characterize this network as a "multilayered system," explaining that the brewer/manufacturer sells directly to a few large independent distributors (whom plaintiffs call master distributors) who in turn resell the beer at a profit to smaller independent wholesalers like plaintiffs. It is often the case that the large wholesalers (hereafter termed direct wholesalers) often sell their supplies of Beck's Beer both to the subjobbing smaller wholesalers (hereafter termed local distributors) *and* to retail outlets, in competition with the local distributors.

When Beck & Co. enters into a distributor agreement with a wholesaler, it determines whether to ship directly to that wholesaler or to require that the distributor purchase its supplies of Beck's Beer from the larger direct wholesalers. If the latter, Beck & Co. notifies its direct wholesalers of the authorized distributor. It is the direct wholesaler who determines what it will charge the local distributor, although Beck & Co. makes suggestions.

A distributor's agreement, specifying the distributor's territory, is required by law to be submitted to the Department of Alcoholic Beverage Control, along with the distributor's current price postings for each brand of beer the distributor sells. (See Bus. & Prof. Code, §§ 25000, 25000.5.) It was defendant Jack Woodlief's deposition testimony that in order to sell a brand of beer a distributor must have such an agreement on file at the

---

[1]The above is derived from the admitted or uncontested facts contained in the pleadings and the declarations and depositions included in the record. Disputed or conflicting evidence is noted as such.

Department, and that those items would remain on file after the manufacturer canceled the distributor's agreement, so long as the wholesaler was legally contesting the termination.

Defendant Beck & Co. entered into a separate distributor agreement with each of the eight plaintiffs, all California beer distributors selling many brands of beer to retailers. Certain of plaintiffs' representatives stated that their discussion with Woodlief regarding entering into this arrangement with Beck & Co. included no mention of contractual terms or conditions for termination. Harry Yamamoto of Towne Distributing declared he understood the distributors' agreement form to be simply a legally imposed prerequisite to selling the Beck's brand. While most of the declarations alluded to the existence of an unspoken understanding that good cause is required for distributor termination, Anthony Ferrigno of Consumers Distributing testified that at the time of the contract it was his understanding that either party could terminate the agreement at will, which understanding was later altered by information he received from other distributors at conventions. Jack Woodlief testified that he made it a practice to terminate distributors only for good cause.

Some time thereafter, Woodlief, acting as Beck's western U.S. sales director, notified each of the plaintiffs that Beck & Co. would terminate its agreement in 30 days. Beck & Co. appointed new distributors to replace the terminated distributors in each territory.

After the effective termination date, when plaintiffs called their usual direct wholesalers to order Beck's Beer, they were informed by most that they would no longer be sold Beck's Beer. To explain this refusal plaintiffs offer declarations containing hearsay statements allegedly made by Jack Woodlief or Jack Lewis to the employees of these direct wholesalers to the effect that Beck & Co.'s representatives told them not to sell to the terminated local distributors. In addition, plaintiff Rausser points to a letter sent by Jack Woodlief to all his wholesalers stating that Rausser Distributing had been terminated and that selling Beck's Beer to Rausser would violate state law. Jack Woodlief declares that the wholesalers were neither threatened nor coerced and defendants objected to the admission of the hearsay statements on the summary judgment motion.

Some plaintiffs were able to continue purchasing Beck's Beer after their termination: Modugno Brothers bought supplies from plaintiff Sunny Distributors; Rausser bought from United Beverage until Woodlief allegedly told its representative to stop selling to Rausser; Rausser then bought from Santa Clara Valley Distributors until they too were terminated by Beck & Co.; it also bought Beck's from Placer Beverage until Woodlief sent Placer

a letter. Gianelli Distributing also purchased supplies from Santa Clara Valley Distributors. It was Woodlief's belief that many earlier-terminated plaintiffs purchased Beck's from the later-terminated Gianelli.

Jack Woodlief received complaints from one direct wholesaler, Markstein Distributing, that terminated subjobbers were selling Beck's in its area, and he testified that Jack Lewis had received similar complaints from two replacement distributors, Premium Distributing and Basso Distributing, though Woodlief did not specify when these complaints were received. Woodlief says he told them there was nothing he could do about it. Woodlief also received complaints from new distributors Goings and Goethe that Rausser was selling Beck's in their territories, which complaints prompted him to send out to Beck's wholesalers the letter stating that Rausser had been terminated and that it would be illegal to sell to it. Woodlief also met with representatives of Santa Clara Valley Distributing on February 14, 1979, and told them that while it was legal to sell to the terminated distributors, it was creating chaos and "screwing up the market." Woodlief also asked them if they planned to continue to sell to plaintiff Gianelli despite its termination by Beck's, to which they replied that they didn't know. Santa Clara Valley Distributors was thereafter terminated effective March 31, 1979, allegedly for low sales.

Woodlief testified that he neglected to send in the appropriate form notifying the Department of Alcoholic Beverage Control of the distributor terminations until December 1978, after the suit had been filed.

### Statement of the Case

Plaintiffs filed their complaint on November 3, 1978, in Alameda County Superior Court, charging Beck & Co., Jack Woodlief, and Jack Lewis with breach of contract, arguing that defendants had breached an implied term of their contract requiring good cause for termination; intentional interference with prospective economic advantage; and violations of the Cartwright Act. Defendants answered on December 21, 1978, denying the relevant allegations and proposing four affirmative defenses: (1) defendants' actions encouraged and promoted competition, (2) defendants' conduct was justified because undertaken in protection of legitimate business interests, (3) the complaint failed to state facts sufficient to constitute a cause of action, and (4) the distributor agreements were unenforceable by reason of failure of consideration.

On March 19, 1979, Santa Clara Valley Distributors filed a complaint in the Superior Court of Santa Clara County against Beck & Co., Dribeck Importers, and Jack Woodlief, charging breach of contract, violations of

the Cartwright Act, and intentional interference with prospective economic advantage. An answer thereto was filed on April 19, 1979.

Plaintiffs' petition for coordination of the two cases was granted on November 2, 1979.

On February 2, 1981, defendants moved for summary judgment as to the claims[2] of the eight local distributors. An order granting summary judgment was signed September 22, 1981; interlocutory partial summary judgment was granted as to plaintiff Gianelli, since one of its claims remained. Final judgment was entered as to the other seven plaintiffs on October 14, 1981. Plaintiffs filed a timely notice of appeal October 30, 1981.

*Discussion*

■ Section 437c, subdivision (c) of the Code of Civil Procedure provides that a motion for summary judgment ". . . shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Since plaintiffs challenge the lower court's grant of summary judgment, this court must liberally construe the evidence contained in plaintiffs' declarations and, viewing the admissible factual evidence in the light most favorable to plaintiffs, we must determine whether evidence was presented which, if true, would support a triable issue of fact as to each cause of action. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-437 [74 Cal.Rptr. 895, 450 P.2d 271]; *Jos. Schlitz Brewing Co.* v. *Downey Distributor* (1980) 109 Cal.App.3d 908, 914 [167 Cal.Rptr. 510]; *Brandlin* v. *Belcher* (1977) 67 Cal.App.3d 997, 999 [134 Cal.Rptr. 1].)

I

*Plaintiffs' Breach of Contract Claim*

■ Plaintiffs contend that summary judgment was erroneously granted on their breach of contract claim because sufficient evidence supports a material question of fact as to whether the contract between Beck & Co. and each plaintiff included an implied requirement of good cause for termination. They argue that the distributor's agreement is silent as to the issue, thus an implied requirement of cause is not precluded, and the question whether the circumstances give rise to an implied term is a factual one. They add that since the distributor's agreement cannot be deemed integrat-

---

[2]The single exception was Gianelli's claim of improper use by defendants of his customer list.

ed, parol evidence is admissible to amplify the contract terms. Finally, they assert that while sufficient factual evidence was presented supporting an *implied-in-fact* good cause requirement, such requirement should be *implied in law* in the interest of fairness, as it has been in the franchise and employment contract context.

### A.

Whether the covenant of good faith and fair dealing implied in all contracts requires that a good cause termination requirement be applied as a matter of law.

 It is well recognized in this state that a covenant of good faith and fair dealing is implied in all contracts, "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) Plaintiffs assert that this covenant must or should be applied to require a good cause for the termination of any contract unless otherwise expressly provided.

 In recent years California courts have held, in certain limited circumstances, that breach of the covenant of good faith and fair dealing may give rise to a cause of action sounding in tort. Most commonly, it has been held that breach of an insurance contract by the insurer in effect breaches the covenant, giving rise to a tort cause of action. (E.g., *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173]; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141]; see *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1116 [207 Cal.Rptr. 123].) "The rationale for finding tortious conduct in insurance contracts has been based largely on the existence of a 'special relationship' between the parties," (*id.,* at p. 1117) creating a "heightened duty on the part of the insurer not to breach the covenant of good faith and fair dealing implicit in its contract, as well as a heightened expectation by the insured that his or her contract will not be breached." (*Id.,* at p. 1118.) The *Wallis* court distinguished between an "ordinary commercial contract" and an insurance contract by noting that the latter involved a disparity in economic situations and bargaining abilities, and that contract damages do not adequately protect insureds. (*Ibid.*)

 The covenant of good faith and fair dealing has also been extended to protect employees in situations where an individual is terminated as an employee after long term service for the employer. In *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722], good cause was required for the employer to terminate plaintiff employee after 18 years

of service on the basis of the employee's longevity of service, the employer's express and published policies not to terminate arbitrarily, and the implied in law covenant of good faith and fair dealing.[3] (*Cleary, supra,* at pp. 455-456.) The court reasoned that "[a]s a result of this covenant, a duty arose on the part of the employer American Airlines to do nothing which would deprive plaintiff, the employee, of the benefits of the employment bargain—benefits . . . accrued during plaintiff's 18 years of employment." (*Id.,* at p. 455; see also, *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 321-323 [171 Cal.Rptr. 917].)

However, such cases carefully limit application of the covenant of good faith and fair dealing to situations in which there is a special relationship due to unequal bargaining power or a special element of reliance, whereas in an ordinary business contract where these special circumstances do not exist, we believe the covenant cannot be applied to specially protect one party by requiring cause for termination. (See, *Triangle Min. Co.* v. *Stauffer Chemical Co.* (9th Cir. 1985) 753 F.2d 734.) "[C]ourts have implied a covenant of good faith in situations involving the termination of employment contracts [citations], insurance contracts, [citations], and—sometimes—franchise or dealership arrangements, [citations]. Where there exists no special element of reliance or unequal bargaining power, however, courts generally conclude that '(w)hen the right to terminate a contract is absolute under the clear wording of the agreement the motive of the party in terminating such an agreement is irrelevant to the question of whether the termination is effective.' [Citations.]" (*Id.,* at p. 740, fn. omitted.)

No case cited by plaintiffs holds that the implied covenant of good faith and fair dealing requires cause for termination of distributorship agreements in the absence of any express or implied agreement to that effect. The implied covenant of good faith and fair dealing in and of itself thus does not require a good cause for termination in this case.

### B.

Whether appellants presented sufficient evidence of an implied understanding that good cause would be required for termination to support the existence of a triable issue of fact.

Plaintiffs contend that an implied-in-fact good-cause requirement for termination is contained in their contracts with Beck & Co. They argue that sufficient evidence was presented to support such an implied term.

---

[3]The court based its ruling in part on a statement made in *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 179, footnote 12 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], that the covenant could apply to wrongfully discharged employees.

The complete text of the very brief distributor's agreement form signed by each plaintiff is as follows:

"It is hereby agreed between Beck & Co., of BREMEN/GERMANY, brewers of BECK'S BEER, and _____, distributor of said beer that the said distributor is authorized to distribute BECK'S BEER under its California License(s) number _____ in the [County of] _____. Distributor's authority hereunder is non-exclusive. This agreement will continue in effect unless and until terminated at any time after January 1, 1973 by thirty days written notice by either party to the other."

Plaintiffs assert that the above writing can reasonably be interpreted to include an implied requirement of good cause for termination. Respondent-defendants argue that no parol evidence may be permitted to interpret or amplify its terms since it is unambiguous and constitutes an integrated writing.

■ Where parties have not agreed that a writing is the exclusive and final embodiment of their contract, the writing is unintegrated, and extrinsic or parol evidence will be admitted to determine the complete agreement. (*Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561].) Thus, a court must make a preliminary determination as to the integration of the document, and to do so it may consider "relevant extrinsic evidence that explains but does not flatly contradict the writing." (*Mobil Oil Corp.* v. *Handley* (1968) 76 Cal.App.3d 956, 961 [143 Cal.Rptr. 321].) ■ ■ ■ ■ "Circumstances at the time of the writing may also aid in the determination of such integration." (*Masterson* v. *Sine, supra,* 68 Cal.2d at p. 226.)[4]

The determination whether a writing constitutes an integrated agreement has in some cases been deemed "a question of law for the court," (*Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 137 [104 Cal.Rptr. 486]) and in other cases seen as "entitled to the same deference on appeal as any other ruling of the court on an issue of fact." (*Mobil Oil Corp., supra,* 76 Cal.App.3d at p. 961.)

■ The trial court in this case made no findings in connection with its grant of the summary judgment motion. Thus the record fails to disclose

---

[4]If a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Sherman* v. *Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, 784.) The court must preliminarily consider evidence concerning the circumstances surrounding the making of the agreement to decide if the language of the contract, in the light of these circumstances, is fairly susceptible to the offered interpretation. If so, the extrinsic evidence is admissible. (*Pacific Gas & E. Co., supra,* 69 Cal.2d at p. 40.)

whether the court determined the agreement to be "integrated." If so, we believe the court's determination to have been clearly erroneous.

Here, it is undisputed that the form agreement entered into by each of the plaintiffs was a standard one-paragraph document, not a negotiated instrument. Although there apparently were no terms discussed by the parties at the time of signing that were not contained in the distributor's agreement, it is not unreasonable that an industrywide custom or usage could be considered part of that agreement.

Declarations by several plaintiffs averred that the short form document was required by the Department of Alcoholic Beverage Control and that it was not understood to set forth all the understandings and agreements concerning the terms of the distributors' relationship with the brewery. The document itself lends credence to this interpretation as it is a preprinted form containing blanks for the name of the distributor and the territory to be covered. ██ "If integration of the writing is not established as a matter of law, and the parol evidence is admitted, then the related questions of credibility of witnesses, and the parties' intent, ordinarily become questions of fact for the jury. [Citations.]" (*Brawthen* v. *H & R Block, Inc.*, *supra*, 28 Cal.App.3d 131, 138, fn. omitted.)

██ The evidence plaintiffs offered to demonstrate that the agreement was not integrated and that there existed an understanding of an implied-in-fact requirement of good cause for termination was primarily provided through the declarations of representatives of three distributors.

William Mizner of Sunny Distributors declared that there is an "understanding existent in the industry: that as long as a wholesaler is doing an adequate job . . . the brewery will continue to allow the wholesaler to handle the brand, . . . ." Mizner also declared that after the agreement was made, Woodlief told him that as long as Sunny Distributing did a good job and took care of the trade, Sunny would keep Beck's brand. Mizner characterized the distributor's agreement as merely a document that wholesalers had to file with the Department of Alcoholic Beverage Control, stating "these short form contracts in the beer industry are simply not meant to set forth all of the understandings and agreements of the terms of the distributor's relationship with the brewery."

Harry Yamamoto of Towne Distributing Co. declared that he did not recall any actual terms and conditions of the business arrangement being discussed other than that Towne would handle Beck's Beer. His understanding of the distributor's agreement was that it did not cover all terms and conditions of the relationship, and that its primary purpose was to enable

the filing of the required document with the department. Yamamoto also declared that it is an accepted custom that a brewery will not pull a line of beer from a distributor except for a valid reason such as decreasing sales. Respondents point out that in his deposition Yamamoto stated that the custom in the industry preventing at will termination was due to fear of lawsuits, but Yamamoto averred that the referred-to testimony concerned situations of which he had heard where a brewery did not, for fear of a lawsuit, terminate a distributor whose sales were decreasing.

P. Frank Modugno of Modugno Brothers, Inc., declared that a good cause requirement for termination is a "recognized custom or practice prevalent in the California beer industry."

Plaintiffs further point to Jack Woodlief's deposition testimony that it was his practice to terminate distributors only for good cause. In other contexts evidence of such practice by an employer has been held to indicate the existence of an implied good cause requirement. (*Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d 311, 317, 317 [personnel policies or practices in the industry are factors in determining whether employment contracts contained an implied term]; *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, 455 [published regulations containing explicit policy of adjudicating employee disputes create an implied promise not to arbitrarily terminate employees].)

We agree with plaintiffs that the foregoing evidence is sufficient to establish that the agreement was *not* integrated and to create an issue of fact as to whether a good cause termination requirement was an implied term of the contracts. Consideration of the circumstances and industry practices at the time of the contract bears upon this determination.

Respondents note that one of the plaintiffs who entered into the distributor's agreement testified that at the time of the agreement his understanding was that it could be terminated without cause. They also emphasize that there is no evidence of oral assurances made to plaintiffs at the time the distributorship agreement was signed concerning any cause requirement for termination. However, respondents do not offer any evidence specifically contradicting the industry custom and practice alleged by plaintiffs, doubtless in recognition that if they did so a dispute as to the practice in the industry would render it improper to grant summary judgment.

The question becomes, then, whether the specific allegations and assertions of an industry wide custom or understanding constitute admissible evidence as to what the parties' understandings actually were. Although we have determined that the agreement was not integrated, we recognize that

even where a writing is intended by the parties as a final expression of their agreement with respect to the terms included therein, those terms "may be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc., § 1856, subd. (c).)[5]

Thus, it appears that plaintiffs should be allowed to rely on a trade usage in the California beer industry even in the absence of any expression of such usage in the written agreement, and plaintiffs may be permitted to attempt to prove the existence of such usage at trial *unless* the proposed custom or trade usage *contradicts* the contractual terms.

The asserted usage of trade is that in the California beer industry good cause is required for the termination of a beer distributor's agreement. The writing upon which defendants rely states "this agreement will continue in effect unless and until terminated at any time after January 1, 1973 by thirty days written notice by either party to the other."

It has been held that an agreement which "may be terminated at any time by either party, by giving the other sixty days notice," could reasonably be interpreted as referring only to the duration of the agreement and not the permissible reasons for its termination, since the clause does not expressly state whether good cause is a prerequisite. (*Sherman* v. *Mutual Benefit Life Ins. Co., supra,* 633 F.2d 782, 783-784, involving a general agency contract between an insurance company and a general insurance agent.) In another case, however, a lease agreement which provided for automatic renewal at the end of each term, subject to termination at the end of any term by 90 days written notice by either party, was deemed to be "flatly contradict[ed]" by plaintiff's proffered parol evidence of an assurance that the franchise would not be canceled without good cause. (*Mobil Oil Corp.* v. *Handley, supra,* 76 Cal.App.3d 956, 962.) The court concluded in *Mobil Oil Corp.,* that the renewal provisions contained in the lease were not only "a 'natural' inclusion in the lease but almost inevitably would be found in

---

[5]Provisions of the California Uniform Commercial Code, although not determinative in this situation, are illustrative of the admissibility of evidence of trade usage to interpret contract terms. California Uniform Commercial Code section 1205 provides that "[a] usage of trade is any practice . . . having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts." Section 1205 continues that a usage of trade may supplement the terms of an agreement, unless the usage is inconsistent with the express terms of the writing. (See also Corbin, Contracts (1950) § 528 and (1960) § 556.) Similarly, California Uniform Commercial Code section 2202 permits parol or extrinsic evidence of a usage of trade to explain or supplement—but not contradict—a writing intended by the parties as a final expression of their agreement. This section has been held to permit introduction of evidence of trade usage even where there is no proof of ambiguity of terms of the writing. (*Balfour, Guthrie & Co.* v. *Gourmet Farms* (1980) 108 Cal.App.3d 181, 190 [166 Cal.Rptr. 422].)

the lease proper, not in a collateral agreement. [Citation.] Further, the subject of renewal and termination is dealt with in express and unambiguous language. The same language appears in both the lease and the retail dealer's contract; and no other language in either document varies or casts doubt on those provisions." (*Id.*, at p. 962.) In that case, the trial court concluded that the lease was an integrated document and that parol evidence of contrary representations on its terms was not admissible to vary the written agreement. The Court of Appeal affirmed. Here, we believe the evidence clearly indicates that the distributor's agreement was not an integrated agreement containing all the terms of the parties' relationship and there is ample evidence that the parties considered good cause for termination to be a part of the agreement.

Thus, the case at issue differs from those where proposed usage of trade has clearly contradicted the terms of the writing. (E.g., *Weber* v. *Milpitas County Water Dist.* (1962) 201 Cal.App.2d 666 [20 Cal.Rptr. 45].) This being the case, it seems the plaintiffs must be given an opportunity to prove the existence of the asserted usage of trade and whether the parties understood such trade usage to constitute an unwritten term of the contract.

Defendants rely upon *Alpha Distrib. Co. of Cal., Inc.* v. *Jack Daniel Distillery* (9th Cir. 1972) 454 F.2d 442, in which a liquor manufacturer and a distributor entered into an oral agreement for an exclusive distributorship; the parties did not expressly discuss termination or duration of the contract. When the distillery terminated Alpha as distributor on 60 days notice, Alpha claimed breach of contract, based upon "an understanding" (*id.*, at p. 447) that the distributorship would not be terminated without good cause. The Ninth Circuit concluded that the oral contract had not been breached, citing the general California rule that "the obligations under [an exclusive distributorship] contract shall be terminable at will by any party upon reasonable notice . . . ." (*Id.*, at p. 449, citing *International Aerial Tramway Corp.* v. *Konrad Doppelmayr & Sohn* (1969) 70 Cal.2d 400, 408 [70 Cal.Rptr. 908, 450 P.2d 284].) This rule is said to apply where the parties have not expressly agreed upon the terms. (See *Sierra Wine & Liquor Co.* v. *Heublein, Inc.* (9th Cir. 1980) 626 F.2d 129, 131-132; *Kolling* v. *Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 718 [187 Cal.Rptr. 797].) In *Alpha Distributing,* Alpha had argued "in effect, that where a distributorship for a particular area is exclusive, and there is no specific agreement to the contrary, the distributorship, is, *as a matter of law,* terminable only for cause." (*Id.*, at p. 448, italics in original.) Although the trial court did not expressly accept this theory in its determination, the United States Court of Appeals rejected it as being unsupported by substantial authority. (*Id.*, at p. 448.) The court also relied upon the fact that the record of the case failed to

disclose any indication of an agreement that the contract was to be terminable only for cause. (*Id.,* at p. 448.)

 In the instant case, we have concluded that the court erred in granting summary judgment as to the cause of action for breach of contract where plaintiffs provided evidence of trade usage and also of practice by the brewery which could have supported a finding that termination for cause was part of the distributorship agreement.

## II

*Cartwright Act Allegations*

### A.

Whether plaintiffs offered sufficient evidence to raise a material question of fact as to whether defendants violated the Cartwright Act. (Bus. & Prof. Code, §§ 16720, 16722, 16726.)

Plaintiffs claim that after their termination as distributors, defendants violated the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), which prohibits combinations in restraint of trade. Specifically, plaintiffs claim that Beck & Co., Jack Woodlief, Jack Lewis, and the direct wholesalers combined with local distributors who replaced plaintiffs to cut off plaintiffs' supplies of Beck's Beer, thus eliminating plaintiffs as a source of competition.

 The Cartwright Act is patterned after the federal Sherman Antitrust Trust Act (15 U.S.C. § 1 et seq.), and cases interpreting the latter are applicable to the former. (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].)

 The United States Supreme Court has drawn two important distinctions central to distributor-termination cases. "First, there is the basic distinction between concerted and independent action—a distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy' between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. [Citations.] Under *Colgate* [*United States* v. *Colgate & Co.* (1919) 250 U. S. 300, 307 (63 L.Ed. 992, 997, 39 S.Ct. 465)], the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce

in the manufacturer's demand in order to avoid termination. [¶] The second important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been *per se* illegal since the early years of national antitrust enforcement. [Citation.] The latter are judged under the rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition. [Citation.]" (*Monsanto Co.* v. *Spray-Rite Service Corp.* (1984) 465 U.S. 752, fn. omitted [79 L.Ed.2d 775, 783-784, 104 S.Ct. 1464, 1469].)

■■ The preliminary requirement of the antitrust law is that there be a "combination" or "conspiracy." "[T]he refusal of a manufacturer to deal with a distributor can constitute a 'combination' in restraint of trade within the purview of the Sherman Act. [Citations.] While a producer may normally choose its distributors, cancellation of a distributorship for anticompetitive reasons violates the antitrust laws and is thus actionable. [Citations.] As noted in *Alpha Distrib. Co. of Cal., Inc.* v. *Jack Daniel Distillery* (9th Cir. 1972) 454 F.2d 442, 452, '[t]he critical inquiry in such "refusal to deal" cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or a conspiracy, is so anticompetitive, in purpose and effect, or both, as to be an unreasonable restraint of trade.' " (*Kolling* v. *Dow Jones & Co., supra,* 137 Cal.App.3d 709, 719.) Similarly, "[u]nilateral refusal by a producer to deal with a distributor, absent proof that it was pursuant to an illegal conspiracy, does not violate the antitrust laws." (*Id.,* at p. 720, citing *United States* v. *Colgate & Co.* (1919) 250 U.S. 300 [63 L.Ed. 992, 39 S.Ct. 465].) ■■ "[A] corporation cannot conspire with itself or its agents for purposes of the antitrust laws." (*Kolling, supra,* at p. 720.) In addition, "[i]f a seller does no more than announce a policy designed to restrain trade, and declines to sell to those who fail to adhere to the policy, no illegal combination is established. (*United States* v. *Parke Davis & Co., supra,* 362 U.S. 29, 44 . . .; *Osborne* v. *Sinclair Refining Co., supra,* 324 F.2d 566, 573.)" (*Kolling, supra,* at p. 721.)

■■ To survive a summary judgment motion plaintiffs were required to present sufficient evidence to demonstrate the existence of a disputed material issue of fact. As earlier noted, plaintiffs presented evidence that Woodlief and Lewis received complaints from newly appointed distributors and from one direct wholesaler about plaintiffs' continuing to sell Beck's Beer in their territories; further, Woodlief admitted that the letter he sent to the wholesalers advising them not to sell to plaintiff Rausser was in response to one of these complaints. It appears that the evidence presented

by plaintiffs was sufficient to support a finding of a combination and concerted action by defendants and new distributors.

### (1) *No per se violation*

However, sufficient facts must also have been presented to support the allegation that defendants' conduct unreasonably restrained trade. (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at p. 930.) Plaintiffs initially attempt to sustain this burden by maintaining that defendants' conduct constitutes a group boycott. Group boycotts, which have been defined as "concerted refusals by traders to deal with other traders" (*Klor's* v. *Broadway-Hale Stores* (1959) 359 U.S. 207, 212 [3 L.Ed.2d 741, 745, 79 S.Ct. 705]) have long been held to constitute per se violations of federal antitrust law even if it is alleged they were reasonable in the circumstances of a particular case and "[e]ven when they operated to lower prices or temporarily to stimulate competition . . . [f]or, . . . 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' " (*Ibid.*)

 Application of per se rules of illegality[6] rather than the so-called "rule-of-reason," which is the prevailing standard of analysis to determine whether a plaintiff has shown a combination or conspiracy in restraint of trade, is appropriate only when it relates to "conduct that is manifestly anticompetitive." (*Continental T.V., Inc.* v. *GTE Sylvania, Inc.* (1977) 433 U.S. 36, 50 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549].) As stated by the United States Supreme Court in *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514], "there are certain agreements or practices which because of their *pernicious effect on competition and lack of any redeeming virtue* are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." (*Id.,* at p. 5 [2 L.Ed.2d at p. 549], italics added.)

 In recent years the courts have applied a per se rule to horizontal restraints with considerably greater alacrity than has been true with respect to apparently vertical restraints of the sort with which we are here con-

---

[6]Among business practices generally considered to constitute per se violations are price fixing, resale price maintenance, group boycotts, tying arrangements, and certain types of reciprocal dealing. (See *Cernuto, Inc.* v. *United Cabinet Corp.* (3d Cir. 1979) 595 F.2d 164, 166.)

cerned.[7] (See, e.g., *Ron Tonkin Gran Turismo* v. *Fiat Distributors* (9th Cir. 1981) 637 F.2d 1376, 1383; *Oreck Corp.* v. *Whirlpool Corp.*, *supra*, 579 F.2d 126; *Kolling* v. *Dow Jones & Co.*, *supra*, 137 Cal.App.3d 709.) As noted in *Continental T.V., Inc.* v. *GTE Sylvania, Inc.*, *supra*, 433 U.S. 36, "[t]he market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." (*Id.*, at pp. 51-52 [53 L.Ed.2d at p. 581], fns. omitted.) For this reason, a per se rule will not be applied to vertical restrictions without preliminary inquiry to determine whether the actual impacts of the arrangement in question indeed have a "'pernicious effect on competition and lack . . . any redeeming virtue.'" (See, e.g., *White Motor Co.* v. *United States* (1963) 372 U.S. 253, 263 [9 L.Ed.2d 738, 747, 83 S.Ct. 696].) Although the United States Supreme Court has not foreclosed "the possibility that particular applications of vertical restrictions might justify *per se* prohibition," it has emphasized that with respect to such restrictions "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." (*Continental T.V., Inc.* v. *GTE Sylvania, Inc.*, *supra*, 433 U.S. at pp. 58-59 [53 L.Ed.2d at p. 585].) As recently reiterated by the Ninth Circuit, "[t]he per se rule should never be applied automatically when the concerted refusal to deal is vertical rather than horizontal. [Citation.] Indeed, generally, it will not be applied." (*Cascade Cabinet Co.* v. *Western Cabinet & Millwork* (9th Cir. 1983) 710 F.2d 1366, 1371; see also *General Business Systems* v. *North Am. Philips Corp.* (9th Cir. 1983) 699 F.2d 965, 978.)

It warrants mention, at this juncture, that per se violations have been found in several cases involving ostensibly "vertical" restrictions that were determined to be "primarily horizontal in nature." Thus, in *Cernuto, Inc.* v. *United Cabinet Corp.*, *supra*, 595 F.2d 164, where a manufacturer terminated a price cutting retailer at the behest of the retailer's competitor, allegedly because of price considerations, the Court of Appeals stated that "[i]f the action of a manufacturer . . . is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one cus-

---

[7]"It is important to distinguish between 'horizontal' restraints, *i.e.* agreements between competitors at the same level of market structure, and 'vertical' restraints, *i.e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors. [Citation.] Horizontal restraints alone have been characterized as 'naked restraints of trade with no purpose except stifling competition,' [citation]; and, therefore *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products [citation]. They are, therefore, to be examined under the *rule of reason* standard." (*Oreck Corp.* v. *Whirlpool Corp.* (2d Cir. 1978) 579 F.2d 126, 131, italics in original.)

tomer is seeking to suppress its competition . . . ." (*Id.*, at p. 168.) The court ruled that sufficient facts had been alleged to support a per se violation. The *Cernuto* court emphasized that the motivating factor in the alleged conspiracy was price, i.e., the conspiracy sought to protect the existing retailer from price competition of a discounter. (*Id.*, at p. 170; see *General Business Systems* v. *North Am. Philips Corp.*, *supra*, 699 F.2d 965.)

Similarly, in *Com-Tel, Inc.* v. *DuKane Corp.* (6th Cir. 1982) 669 F.2d 404, the plaintiff was effectively rendered unable to perform a work project for which it had successfully bid because a combination initiated by a competitor and involving the manufacturer of equipment specified in the bid specifications prevented it from obtaining the necessary equipment. Although the coercive pressure was applied vertically, by the manufacturer, the court concluded "that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott." (*Id.*, at p. 409.)

 Plaintiffs' effort to characterize the instant case as factually analogous to *Cernuto* and *Com-Tel* is unavailing. Though there is evidence that Beck & Co., through its agents Woodlief and Lewis, received and acted in response to complaints by distributors in competition with plaintiffs, such evidence is hardly dispositive of the issues of the purpose and effect of the restraint, which are, of course, the critical issues. "Restraints solicited by a distributor but implemented by a manufacturer are not automatically per se violations. [Citation.] Restraints of this type come within the per se rule only if they 'clearly had, or [were] likely to have, a pernicious effect on competition and lacked any redeeming virtue. [Citations.]' " (*General Business Systems* v. *North Am. Philips Corp.*, *supra*, 699 F.2d at p. 978.) Thus, evidence that a vertical restraint was imposed in response to complaints from a plaintiff's direct competitors will not alone support a group boycott theory, even if the benefits of the restraint may redound in part to the benefit of those competitors. For a court to uphold a finding of an antitrust conspiracy, "something more than evidence of complaints is needed . . . . [t]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " (*Monsanto Co.* v. *Spray-Rite Service Corp.*, *supra*, 465 U.S. 752 [79 L.Ed.2d 775, 785-786, 104 S.Ct. 1464, 1471].)[8]

---

[8]The parties have also referred to *Battle* v. *Lubrizol Corp.* (8th Cir. 1982) 673 F.2d 984, 987, in discussing whether the per se rule or the rule of reason is appropriate in determining whether a technically vertical restraint of trade which smacks of horizontal price fixing interference unduly restrains trade under the Sherman Act. A panel of the Court of Appeals in that case reversed the trial court's judgment in favor of the manufacturer. Rehearing was granted on the issue whether an inference of conspiracy may be drawn from competitor

In order to sustain a group boycott theory of per se illegality with respect to restraints that are vertically imposed, there must be a showing that the restraint imposed by the manufacturer was not only conceived of and initiated by those in direct competition with the plaintiff, but that those competitors used their economic power or position to influence the manufacturer to act, not for its own advantage, but solely for the advantage of those competitors. Such a showing cannot here be made.

Even indulging the assumption that the restraint imposed by Beck's was prompted by complaints from plaintiffs' competitors, there is no evidence that Beck's was compelled to act on those complaints because of an exertion of economic power. Nor is there evidence that Beck's acted solely or even primarily for the benefit of plaintiffs' competitors rather than for its own benefit. Finally, and perhaps most significantly, there is no evidence that the challenged restraint had any "pernicious effect on competition and lacked any redeeming virtue."

■■ ■■ ■■ ■■ ■■ Clearly, "conspiracy among dealers and their supplying manufacturer for the purpose of retail price maintenance that would benefit the dealers" would be "horizontal in nature and *per se* illegal." (*Donald B. Rice Tire Co.* v. *Michelin Tire Corp.* (4th Cir. 1981) 638 F.2d 15, 16.) But that is not the case here; that is, there is no evidence whatever that plaintiffs were engaged in price cutting and that the challenged restraint was designed to or did eliminate such competition. Thus, the benefit of the restraint in this case appears to redound primarily to the benefit of the manufacturer as a result of increased interbrand competition.[9] A restraint having this result is considered "vertical" and is analyzed under the rule of reason. (*Ibid.*) As noted by the Ninth Circuit, "it is interbrand competition which is the primary concern of the antitrust laws" (*Ron Tonkin Gran Turismo, Inc., supra,* 637 F.2d at pp. 1385-1386, citing *Continental T.V., Inc.* v. *GTE Sylvania, supra,* 433 U.S. at p. 52, fn. 19 [53 L.Ed.2d

---

complaints alone and the judgment of the trial court was affirmed by an equally divided court. (*Battle* v. *Watson* (8th Cir. 1982) 712 F.2d 1238.) The decision is thus without precedential value. However, it is noteworthy that the opinion of the court on rehearing held that "[a] manufacturer's termination after receiving complaints cannot be characterized in and of itself as responsive action permitting an inference of concerted action. To do so is to nullify the well-recognized rule that termination following complaints by competitors is not sufficient to allow an inference of concerted action." (*Id.,* at p. 1240.)

[9]"Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These 'redeeming virtues' are implicit in every decision sustaining vertical restrictions under the rule of reason. Economists have identified a number of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. See, *e.g.,* Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards. 30 Law & Contemp. Prob. 506, 511 (1965)." (*Continental T.V., Inc.* v. *GTE Sylvania, Inc., supra,* 433 U.S. at pp. 54-55 [53 L.Ed.2d at p. 583].)

at p. 581]); therefore a restraint which is not anticompetitive in this respect is not one that should be subject to a per se rule of illegality.

"Surely a manufacturer and its national or regional distributor, whether a subsidiary or an independent, can agree to transfer their business from one wholesaler to another without running afoul of the group boycott *per se* rule, in the absence of some forbidden anti-competitive or monopolistic objective. [Citations.]" (*Joseph E. Seagram & Sons, Inc.* v. *Hawaiian Oke & Liquors, Ltd.* (9th Cir. 1969) 416 F.2d 71, 81-82.) Likewise, in this case the manufacturer determined to transfer its business from certain distributors to others. Absent evidence that points to any forbidden anticompetitive purpose, the mere fact that this business decision benefitted the new distributors does not render it a per se violation of the antitrust law. On the contrary, the propriety of the manufacturers' conduct must be analyzed under the rule of reason.

(2) *"Rule of reason" analysis*

■■■■ Generally, in determining whether conduct unreasonably restrains trade, "[a] rule of reason analysis requires a determination of whether . . . its anti-competitive effects outweigh its pro-competitive effects." (*Columbia Broadcasting Sys.* v. *Am. Soc. of Composers* (2d Cir. 1980) 620 F.2d 930, 934.)

While it is undisputed that to prevail at trial under a rule of reason, plaintiffs must prove that the alleged anticompetitive effects on in*tra*brand competition outweigh any pro-competitive effects on in*ter*brand competition of the restraint, the parties dispute the quantity of evidence sufficient to survive summary judgment under a rule of reason analysis. Plaintiffs contend that defendants did not sustain their burden under Code of Civil Procedure section 437c, and summary judgment was erroneously granted because defendants failed to demonstrate that there was no factual dispute concerning whether pro- or anticompetitive effect weighed stronger. Plaintiffs argue that to survive summary judgment "it is sufficient to show that competition was reduced in the market for Beck's Beer," and that they did so by showing the competition was reduced by the removal of them as competitors. Plaintiffs reason as follows: "*After* plaintiffs' terminations as authorized distributors but *before* defendants acted to cut off plaintiffs' supplies, a retailer could obtain Beck's Beer from three sources: The master wholesaler, the new authorized local wholesaler, and from plaintiffs. *After* Beck & Co. cut off plaintiffs' supplies, this number was *reduced* to two: The master wholesaler and the new authorized local wholesaler. This reduced the number of competitors for a given retailer's business. As pointed

out in *Eiberger* v. *Sony, supra* [*Eiberger* v. *Sony Corp. of America* (2d Cir. 1980) 622 F.2d 1068, 1081], eliminating one dealer of the given product line produces an 'inevitable reduction of intrabrand competition.'" (Original italics.)

██, ██ While it is true that there is generally "a greater reluctance to uphold a grant of summary judgment when the rule of reason is the appropriate standard . . . ." (*Ron Tonkin Gran Turismo* v. *Fiat Distrib., supra*, 637 F.2d 1376, 1388), it is also true that where there exists "no tenable *per se* boycott theory 'appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . . .'" (*ibid.*) and consequently to survive a summary judgment motion. Plaintiffs' evidence here does not provide the factual support for a substantial anticompetitive effect necessary to sustain an antitrust claim under a rule of reason. The evidence reflects that plaintiffs were all replaced with new Beck's distributors in their territories, and that there were the same number of competitors while plaintiffs continued as authorized distributors as there were following plaintiffs' termination. It is true that plaintiffs constituted "extra competitors" while they were still able to obtain supplies of Beck's. However, their ability to obtain supplies for a few months after their terminations does not devolve upon defendants the responsibility to permanently supply these terminated distributors with the product or to allow their wholesalers to supply such unauthorized distributors in order to avoid antitrust liability.

Thus utilizing the rule of reason analysis the trial court properly sustained summary judgment as to plaintiffs' Cartwright Act claims.

### B.

Whether plaintiff Rausser Distributing presented sufficient evidence to raise a question of material fact as to whether defendants violated the Cartwright Act's exclusive dealing provision. (Bus. & Prof. Code, § 16727.)

██ ██ ██ Plaintiff Rausser claims that the trial court erroneously granted defendant's summary judgment motion on Rausser's separate antitrust claim, despite the fact that it was sufficiently pled, and the defendants did not address the merits of this claim on their summary judgment motion.[10]

---

[10]The parties' briefing centers almost entirely upon the issue of whether Rausser sufficiently pleaded this violation in his complaint and whether the court erred in failing to consider this claim on the summary judgment motion. Although we have determined to address the merits, as we believe summary judgment was properly granted upon the antitrust claims of all plaintiffs, it does appear that the issue may have been inadequately briefed.

Defendants assert that this cause of action was not sufficiently pled and that therefore

The complaint includes a paragraph alleging a violation of California Business and Professions Code sections 16720 and 16727 and Rausser claims it was terminated because it refused to cease handling Beck's competitors' products, Heineken and St. Pauli Girl Beer. The complaint incorporated a letter from Woodlief to Rausser asserting that the termination was due to the incompatibility of handling Heineken and St. Pauli Girl with Beck's Beer within the same distributorship. Woodlief's deposition admits that Rausser was terminated for this reason, and that Rausser was told of this. Plaintiffs assert that the above establishes a violation of section 16727. Plaintiffs emphasize that since the claim was not addressed by defendants' summary judgment papers, the trial court summary adjudication of this claim is unsupportable.

Section 16727 provides: "It shall be unlawful for any person to . . . contract for the sale of goods, . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such . . . contract for sale or such condition . . . may be to substantially lessen competition or tend to create a monopoly."

 Section 16727 incorporates into the Cartwright Act the essential provisions of section 3 of the federal Clayton Act (15 U.S.C.A. § 14), and federal interpretations of Clayton Act section 3 are persuasive in interpreting Business and Professions Code section 16727. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp., supra,* 69 Cal.2d 305, 315.)

 It is plaintiffs' contention that conditioning retention of Rausser as distributor on Rausser's agreement to drop certain other brands constitutes a violation of section 16727. This is not the case.

---

summary dismissal of it was appropriate. Business and Professions Code section 16756 provides that a cause of action is sufficiently pled if it states the "purpose or effects of the . . . combination, and that the accused is a member of . . . it, . . . without giving its name or description, or how, when or where it was created." The complaint must contain "factual allegations of specific conduct" related to the cause of action. (*Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464]; *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 327 [70 Cal.Rptr. 849, 444 P.2d 481].)

Rausser's complaint, in paragraph 86, includes an allegation of a section 16727 violation, and further alleges a purpose of preventing and substantially lessening competition in the wholesale distribution of Beck's Beer in the relevant counties, thereby maintaining an artificially high resale price. Rausser contends that the complaint incorporates *by reference* the factual allegation that Rausser was terminated because it refused to cease handling Beck's competitors. Paragraph 83 of the complaint *does* incorporate paragraph 77 which in turn incorporates exhibit F, the letter which discusses Beck's reasons for terminating Rausser. However, paragraph 86, the only one that discusses section 16727, does *not* incorporate those factual allegations. (Since the complaint itself nowhere specifically alleges particular facts relating to an illegal exclusive dealing contract, it is possible that paragraph 86 contains a typographical error, and that § 16727 was intended to be 16726.)

" 'The anti-trust laws do not prohibit a manufacturer or distributor from selecting dealers who will devote their time and energies to selling the former's products and a manufacturer is not compelled to retain dealers having divided loyalties adverse to the interests of the said manufacturer or distributor.' " (*Timken Roller Bearing Company* v. *F.T.C.* (6th Cir. 1962) 299 F.2d 839, 842, cert. den., 371 U.S. 861 [9 L.Ed.2d 99, 83 S.Ct. 118], quoting *McElhenney Co.* v. *Western Auto Supply Company* (W.D.S.C. 1958) 167 F.Supp. 949, affd. (4th Cir. 1959) 269 F.2d 332, 337-338; see also, *Associated Beverages Co.* v. *P. Ballantine & Sons* (5th Cir. 1961) 287 F.2d 261, 265; *Dillon Materials Handling, Inc.* v. *Albion Industries* (5th Cir. 1978) 567 F.2d 1299, 1306, and cases there cited; *A.B.C. Distrib. Co.* v. *Distillers Distr. Corp.* (1957) 154 Cal.App.2d 175, 188-190 [316 P.2d 71].) " 'This is the prevailing law in the absence of an *agreement* compelling a distributor to refrain from selling a competitor's goods.' " (*Rohm and Haas Co.* v. *Dawson Chemical Co., Inc.* (S.D. Tex. 1983) 557 F.Supp. 739, 844, italics added; see also *Business Equipment Center, Ltd.* v. *DeJur-Amsco* (D.D.C. 1978) 465 F.Supp. 775, 786.) " 'There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another.' " (*Dillon Materials Handling, Inc.* v. *Albion Industries, supra,* at p. 1306.)

Thus, Rausser's allegation that defendants terminated his distributorship does not state a claim under section 16727 and the trial court's grant of summary judgment as to all plaintiffs on the Cartwright Act claims was proper.

### III

*Intentional Interference With Prospective Economic Advantage Claim*

#### A.

Whether plaintiffs presented sufficient evidence to withstand summary judgment on their claim of intentional interference with prospective economic advantage.

All plaintiffs contend that summary judgment was erroneously granted on their claim of tortious interference with prospective economic advantage, as the record contained sufficient evidence supporting a question of fact as to whether defendants intentionally disrupted the business relationship between plaintiffs and the independent direct wholesalers who had previously supplied plaintiffs with Beck's Beer. Plaintiffs submit that the direct wholesalers must be considered independent third parties for purposes of this

cause of action, and assert that questions of fact exist as to whether defendants interfered with this relationship and whether such interference was privileged by virtue of defendants' relationship with the direct wholesalers.

Plaintiffs further contend that, despite its hearsay character, the evidence presented was sufficient, as the proffered hearsay statements were admissible under Evidence Code section 1223, the coconspirator exception to the hearsay rule.

Essentially, defendants argue that summary judgment on this cause of action was proper as there was no admissible evidence of interference; the relationship between defendant Beck & Co. and the wholesalers was such that there was no independent third party relationship between wholesalers and plaintiffs with which to interfere. In any event, defendants claim, their actions were privileged.

Initially, defendants question whether plaintiffs presented sufficient admissible evidence to support their intentional interference claim, arguing that only inadmissible hearsay supports the cause of action. Code of Civil Procedure section 437c provides that declarations shall set forth *admissible* evidence, and this excludes properly objected to hearsay statements. (*Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 662 [192 Cal.Rptr. 732]; *Apodoca* v. *Schiffahrtsgesellschaft De Vries & Co.* (1962) 199 Cal.App.2d 605, 607 [18 Cal.Rptr. 869].)

 Plaintiffs argue that the contested hearsay statements, allegedly made by Woodlief and Lewis to certain representatives of the direct wholesalers, fall within the coconspirator exception to the hearsay rule, Evidence Code section 1223.[11] They assert that as long as they present independent evidence connecting the direct wholesalers to the conspiracy to eliminate plaintiffs' sources of supplies of Beck's Beer, section 1223 may be applied to admit the contested hearsay. They therefore point to (a) the letter sent by Woodlief to Santa Clara Valley Distributors and the other direct wholesalers and (b) admissions by Woodlief that Lewis and he received complaints from at least one direct wholesaler about sales by terminated distributors, and that they approached Santa Clara Valley Distributors, the apparent source

---

[11]Evidence Code section 1223 provides that: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

of the "bootleg" sales, to attempt to convince them to stop selling to unauthorized distributors.

It appears that the statements by Woodlief or Lewis to the wholesalers are sufficient indicia of a conspiracy to permit application of section 1223. However, the hearsay statements create a multiple hearsay problem. The statements were then conveyed by those wholesalers to the plaintiffs, and this second level of hearsay is not covered by section 1223, which requires that a coconspirator's admission must be made *in furtherance of the conspiracy.* Since the wholesalers' statements to the plaintiffs were clearly not in furtherance of the alleged conspiracy, the hearsay contained in plaintiffs' affidavits remains inadmissible.

The evidence remaining to support plaintiffs' claim of intentional interference with their source of supply of Beck's is as discussed above: (1) the letter sent to the wholesalers regarding sales to Rausser, and (2) the admissions by Woodlief that Lewis and he received complaints regarding sales by unauthorized distributors, and that they attempted to convince the owners of Santa Clara Valley Distributors to stop selling Beck's to unauthorized distributors. While this evidence is slim support for a claim of intentional interference with prospective economic advantage, it may be considered sufficient to create a triable question of fact and to withstand summary judgment.

■ In order to prove their cause of action plaintiffs must show "the existence of either a contractual relationship or a prospective business relationship advantageous to them, that defendants had knowledge of the advantageous relationship, that defendants intentionally or negligently induced the breach of the relationship, that the acts or conduct of the defendants were wrongful, and proximately caused plaintiff's injury and damage by interfering with the relationship causing a business loss. [Citations.]" (*Baldwin* v. *Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 407 [145 Cal.Rptr. 406]; see *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 828-829 [122 Cal.Rptr. 745, 537 P.2d 865].) Defendants dispute that there was an independent economic relationship between the plaintiffs and the direct wholesalers, arguing that the direct wholesalers simply acted as a conduit for delivery of plaintiffs' shipments of Beck's Beer as plaintiffs sold too low a volume to receive direct shipment. Plaintiffs counter that since the direct wholesalers ran independent operations, selling many brands and selling to plaintiffs at a profitable price of their own choosing, they must be considered third parties. It appears to us that the question whether direct wholesalers were sufficiently independent to be considered third parties presents a question of fact, as does the issue of whether Beck & Co. was the actual cause

of the cutting off of plaintiffs' supplies from these wholesalers. (See Rest.2d Torts, § 766, com. o.)[12]

Defendant Beck & Co. contends that its actions were privileged and therefore justified. In California it is clear that justification is an affirmative defense which must be pleaded by the defendant. (*Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18-19 [144 Cal.Rptr. 664]; *A.F. Arnold & Co.* v. *Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 714 [104 Cal.Rptr. 96]; see *Herron* v. *State Farm Mut. Ins. Co.* (1961) 56 Cal.2d 202, 207 [14 Cal.Rptr. 294, 363 P.2d 310].) Moreover, even when the tort claimed is that of interference with prospective economic advantage and the circumstances under which such interference will be justified are considerably broader than is the case for inducement of breach of contract, there is no immunity from liability "if unfair methods are used in interfering in such advantageous relations. [Citations.]" (*Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 547 [145 P.2d 305].) As stated by the court in *Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d 13, "even if the means used by the defendant are entirely lawful, intentional interference with prospective economic advantage constitutes actionable wrong *if* it results in damages to the plaintiff, *and* the defendant's conduct is not excused by a legally recognized privilege or justification. [Citations.]" (*Id.,* at p. 20, fn. omitted.) The court continued that "as a general rule, the determination of whether the defendant's conduct of interfering with . . . prospective economic advantage is privileged comprises a *factual issue* to be decided upon all the circumstances of the case. [italics added.] '*Whether an intentional interference by a third party is justifiable depends upon* a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, *considering all circumstances* including the nature of the actor's conduct and the relationship between the parties.' [Citations.] In harmony therewith, Restatement of Torts section 767, provides that 'in determining whether there is a privilege to act in the manner stated in § 766, the following are important factors: [¶] (a) the nature of the actor's conduct, [¶] (b) the nature of the expectancy with which his conduct interferes, [¶] (c) the relationship between the parties, [¶] (d) the interests sought to be advanced by the actor and [¶] (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.' Significantly enough, comment d to section 767 spells out that '*the question on the issue of privilege is whether the actor's conduct was fair*

---

[12]Restatement Second of Torts section 766, comment o, provides in pertinent part: "o. *Causation.* The question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact. . . ."

*and reasonable under the circumstances . . .'* (italics added)." (*Lowell, supra,* at pp. 20-21.)[13]

■ The foregoing analysis strongly supports plaintiffs' contention that the existence of a privilege is a question of fact. Defendants counter that privilege in this case is a matter of law because defendants' alleged unlawful conduct occurred *after* the effective dates of plaintiffs' termination as distributors. For this proposition defendants cite *Cal. Bev. etc. Co.* v. *Distillers Distrib. Corp.* (1958) 158 Cal.App.2d 758, 769 [323 P.2d 517]. In *California Beverage,* an employee of plaintiff (a wholesale distributor of alcoholic beverages) testified that he worked at one time for defendant, (a liquor manufacturer) and that he was told that plaintiff distributor was no longer to be a distributor and that he was instructed to confine his operations to other distributors. He testified that thereafter he instructed retailers that plaintiff was no longer a distributor, that he sent plaintiff's orders to one of the other distributors, and that he diverted from plaintiff to other distributors purchases by retailers who had regularly purchased their product from plaintiff. The Court of Appeal held that "[t]his testimony, if believed by the jury, would lend support to a finding that Calvert [defendant], through its employee, committed acts constituting unlawful interference with a business relationship . . . ." (*Id.,* at p. 769.) However, the court further pointed out that any retrial on this factual issue should be limited to the damages suffered by plaintiff prior to the expiration of its distributorship. "Even though plaintiff still had a quantity of Calvert products on hand, Calvert was at liberty to encourage retailers to purchase their supplies of its products from its then distributors." (*Ibid.*)

We agree with plaintiffs that *California Beverage* is not pertinent to the facts of this case in that the subject of the claimed interference here is the relationship between plaintiff and its suppliers whereas in *California Beverage,* the interference was between plaintiff and its purchasers. As plaintiffs aptly point out, *California Beverage* does not discuss the issue of interference with suppliers "because the distributor there purchased its supply directly from the defendant, and not from any independent third party. The defendant could therefore terminate the distributor's supply without involving any third party. Thus, if Beck & Co. had limited itself to having Woodlief and Lewis go around to the retail accounts and encourage them to buy Beck's Beer from the replacement wholesalers rather than plaintiffs no actionable interference would necessarily arise. In that situation, the plaintiffs could still *compete* with their replacements for the business of the particular retail account. However, when as here the interference operates at the sup-

---

[13]Although section 767 of the Restatement Second contains some changes in phrasing, the essence of the section and the applicable comment (now com. b) remains unchanged.

ply level the effect thereof is to eliminate this competition. This is one of the factual circumstances that makes the question of defendants' privilege or justification an issue for the fact finder and markedly differentiates this case from *California Beverage.*" As defendant Beck & Co. asserts no legally recognized privilege, other than to boldly assert that interference with suppliers is justifiable, we are compelled to conclude that this cause of action contains a disputed issue of material fact regarding the existence of privilege.

The question remains whether Beck & Co.'s termination of Santa Clara Valley Distributors may have constituted an intentional interference with plaintiffs' relations with that wholesaler. Defendants assert that termination of Santa Clara Valley Distributors was not itself interference as defendants were free to terminate their relationship with their wholesaler without giving rise to a cause of action. However, the cases relied upon by defendants, *Lawless* v. *Brotherhood of Painters* (1956) 143 Cal.App.2d 474, 478 [300 P.2d 159], and *Adult Film Association* v. *Times Mirror Co.* (1979) 97 Cal.App.3d 77, 80-81 [158 Cal.Rptr. 547], do not support this assertion. *Lawless* was grounded on the principle that "[o]ne who is in a confidential relationship with a party to a contract is privileged to induce the breach of that contract." (*Id.,* at p. 478.) The court held that a union stood in a confidential position to one of its locals and that the union was therefore privileged to induce the breach of the local's contract with plaintiff. Moreover, as an alternative basis of privilege *Lawless* also referred to the principle that where "two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result would be to cause a breach of the other contract." (*Ibid.*) Neither circumstances appears relevant to the instant case. In *Adult Film Association* v. *Times Mirror Co., supra,* 97 Cal.App.3d 77, the court held that a businessman who refuses to continue to deal with a former customer incurs no liability, and that the plaintiffs' cause of action, alleging interference with the relationship between plaintiff producers of pornographic films and potential customers by defendant newspaper's refusal to publish plaintiffs' advertisements, failed to state a cause of action that could survive a demurrer. In that case, the court emphasized that the newspapers had no duty to continue their relationship with plaintiff and characterized the newspaper's conduct as a refusal to deal with a former customer. The court pointed out that there were no allegations that defendant newspaper prevented anyone from attending the theatres in which plaintiffs pictures were shown, nor was there any evidence whatsoever that the newspaper "induced" other papers to follow a similar policy. Although we may agree that Beck & Co. was free to terminate its agreement with Santa Clara Valley Distributors (a proposition currently under dispute in the coordinated portion of this lawsuit not before us), we believe that it remains

a question of fact whether such termination under all the circumstances constituted an interference with the relationship between plaintiffs and Santa Clara Valley Distributors, particularly in light of the admonition in *Lowell* that "even if the means used by the defendant are entirely lawful, intentional interference with prospective economic advantage constitutes actionable wrong *if* it results in damages to the plaintiff, *and* the defendant's conduct is not excused by a legally recognized privilege or justification." (*Lowell, supra,* 79 Cal.App.3d at p. 20.)

### B.

Whether plaintiff Rausser presented sufficient evidence to withstand summary judgment on its claim of intentional interference with prospective economic advantage.

██ ██ Plaintiff Rausser contends that by sending the letter to the direct wholesalers incorrectly informing them that it was illegal to sell to Rausser, defendants intentionally interfered with its business relations. Further, Rausser contends that a material issue exists as to whether Woodlief had the authority to terminate distributors. We believe that our analysis of the prior issue is determinative of Rausser's contention that by the letter sent to wholesalers defendants tortiously interfered with its prospective economic advantage. It appears clear that disputed questions of fact exist regarding the relationship and character of the wholesalers as possible third parties, the question of causation,[14] and the question of privilege.[15]

In light of Woodlief's apparently inconsistent statements prior to the summary judgment motion that he was not an employee or agent of Beck & Co., we believe the issue of Woodlief's authority to terminate Beck & Co.'s contract with Rausser presents a disputed issue of fact. However, it is questionable that this issue has any bearing upon the propriety of the grant of summary judgment as to the intentional interference claim, since it does not appear to be material to that claim. There is no dispute that plaintiffs were

---

[14]Although defendants maintain that causation is not present as Rausser was able to continue purchasing beer from Santa Clara Valley Distributors notwithstanding the letters from Woodlief, we believe that the question of damages is a factual one, as the letter may have contributed to the reduction of sources of supply for plaintiff Rausser.

[15]Defendants state that a person, who in good faith, merely gives information or advice to other persons interested therein is not guilty of intentional interference with prospective business relations, citing Restatement Second of Torts, section 772. However, as noted by the court in *Lowell,* "[r]eliance on this theory is misplaced since, as pointed out in comment a to the Restatement of Torts section 772, one of the conditions of such justification is '[1] that the advice be requested . . .'" (*Id.,* at p. 20, fn. 1.) In the present case nothing in the allegations of the complaint or presented at summary judgment suggests that defendants were requested by the wholesalers to advise them concerning supplying plaintiff.

in fact terminated. Moreover, it appears certain that if indeed Woodlief did not have the authority, Beck & Co. by their subsequent actions, including their concessions in the instant case regarding Woodlief's authority, have ratified Woodlief's actions.

The judgment is reversed and the cause remanded to the trial court for further proceedings in accordance with the views expressed herein.

Rouse, J., and Smith, J., concurred.