[No. F020078. Fifth Dist. June 8, 1995.]

VARNI BROS. CORPORATION et al., Plaintiffs and Appellants, v. WINE WORLD, INC., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## Counsel

James Duryea, Jr., James W. Moore, Carr, DeFilippo & Ferrell and Robert J. Yorio for Plaintiffs and Appellants.

Stockton & Sadler, James L. Sadler, Howrey & Simon and Carmine R. Zarlenga for Defendant and Respondent.

## Opinion

## HARRIS, J.—

### Statement of the Case and Facts

Wine World, Inc. (Wine World) is a producer and supplier of wines, including Beringer, Napa Ridge, Chateau Souverain and Meridian. Wine World distributes its wines through a network of independent distributors located throughout the United States. Brand Wines & Spirits, Inc. (Brand) and Varni Bros. Corporation (Varni) are former distributors for Wine World in the Fresno and Modesto areas, respectively. Varni began distributing for Wine World in 1975 and Brand began in 1985. The distributing arrangements were never formalized in written contracts.

Although Brand did not begin distributing for Wine World until 1985, Brand's founder, Harvey Braziel, had distributed for Wine World in the Fresno area while with a company called M&T Distributing Company. After consulting with Wine World in 1985, Brand and Wine World agreed that M&T would assign its distribution rights to Brand.

As wine distributors, Brand and Varni purchased wine from suppliers for resale to retailers in their assigned territories. The development of a market

for the vintner's products was a joint effort between the vintner and the distributor. Distributors provided a wide variety of services to suppliers, including promotional sales calls on retailers, placement of advertising, and periodic removal of dated wine from retailers' shelves. Varni and Brand maintained warehouses and fleets of trucks and trained sales people to promote the portfolios of their suppliers, including Wine World. Wine World and other suppliers gave Varni and Brand written sales quotas or objectives to meet, and met periodically with them to evaluate their performances. In some instances, the duties of distributors were spelled out in written contracts. However, up until 1985 at the earliest, written distribution contracts were a rare exception in the wine industry. Rather, suppliers dealt with wholesale distributors on the basis of a handshake; everyone understood what a "distributorship" involved.

In 1989, Wine World decided to consolidate its distribution network in Northern California to a single distributor. Wine World terminated its distributing arrangements with both Varni and Brand on August 28, 1989, by 60 days' written notice.

It is undisputed that at the time Varni and Brand agreed to distribute for Wine World there were no substantive discussions regarding any terms of the distributorship arrangement. According to Wine World, it had no internal policy limiting the termination of its distributors and was not aware of any industry custom regarding termination. On the other hand, according to Braziel, he had been told it was Wine World's policy to build a record over the course of six months to a year to justify a termination.

While there was a dispute as to whether it was the prevailing custom at the time of the agreements that a supplier could not unilaterally terminate a distribution agreement except for poor performance or failure to pay invoices, there was no evidence proffered that any such custom continued to exist after 1985 or 1986. However, appellants proffered some evidence in an attempt to show that thereafter a custom and usage existed nonetheless requiring the supplier to pay some sort of severance compensation to the terminated distributor based on rendered services in establishing markets and sales volume for the supplier. In 1975 and 1985, respectively, when Varni and Brand agreed to distribute for Wine World, they expected they would not be terminated except for reasons established by the then prevailing industry custom.

A complaint was filed by Varni and Brand on July 25, 1991, alleging two causes of action, one for each plaintiff, for breach of implied contracts. The complaint alleged the contracts were only terminable for poor performance based on industry custom or trade usage, Wine World practices, and longevity of business relationships. Wine World answered by general denial and asserted several affirmative defenses.

Wine World filed separate summary judgment motions against Varni and Brand. Both motions were granted. Brand's motion for reconsideration was denied. Varni and Brand (collectively appellants) filed a timely notice of appeal.

### DISCUSSION

### I.

### *Termination*

Appellants contend the trial court erred in granting Wine World's motions for summary judgment. The motions were granted on three alternative grounds: (1) parol evidence that there was an implied understanding between the parties that good cause would be required for termination under the agreements was not admissible; (2) appellants could not prevail on the merits because industry custom requiring termination for good cause applied only until 1985, and not up to 1989 when the relationship was terminated; and (3) because there was no agreement that the distributing arrangements would last for a fixed term of years, the contracts were of indefinite duration making them terminable at will under California Uniform Commercial Code section 2309.

### *Standard of Review*

Summary judgment is proper if the supporting papers are sufficient to sustain a judgment in favor of the moving party as a matter of law and the opposing party presents no evidence giving rise to a triable issue as to any material fact. (Code Civ. Proc., § 437c, subd. (c).) To prevail on a summary judgment motion, the defendant must conclusively negate a necessary element of the plaintiff's case or establish a complete defense. (*Horsemen's Benevolent & Protective Assn.* v. *Insurance Co. of North America* (1990) 222 Cal.App.3d 816, 820 [271 Cal.Rptr. 838].) Where the evidence presented by defendant does not support judgment in his favor, the motion must be denied without looking at the opposing evidence, if any, submitted by plaintiff. (*Albertini* v. *Schaefer* (1979) 97 Cal.App.3d 822, 831 [159 Cal.Rptr. 98].) The evidence of the moving party is strictly construed and that of the opposing party liberally construed. (*Coppola* v. *Superior Court* (1989) 211 Cal.App.3d 848, 862 [259 Cal.Rptr. 811].) Where there is no material issue of fact to be tried and the sole question before the court is one of law, it is the duty of the trial court on a motion for summary judgment to hear and determine the issue of law. (*Rombalski* v. *City of Laguna Beach* (1989) 213 Cal.App.3d 842, 848 [261 Cal.Rptr. 820].)

In reviewing a grant of summary judgment, an appellate court must make its own independent determination of the construction and effect of the

papers submitted. Review of the trial court's determination involves pure matters of law and requires reassessment of the legal significance of the documents. The reviewing court applies the same three-step analysis as that of the trial court: (1) identification of issues framed by the pleadings; (2) determination of whether the moving party has established facts which negate the opponent's claim and justify a judgment in movant's favor; and (3) determination of whether the opponent demonstrates the existence of a triable, material factual issue. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1513-1515 [285 Cal.Rptr. 385]; *Preis* v. *American Indemnity Co.* (1990) 220 Cal.App.3d 752, 757 [269 Cal.Rptr. 617].)

*Implied-in-fact Contract*

The underlying basis for the breach of contract actions was the alleged existence of implied-in-fact contracts. Appellants rely on the case of *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020 [219 Cal.Rptr. 203] for the proposition that where a usage of trade exists, it may constitute a term of a contract. The trial court in the present case, in granting summary judgment, distinguished the *Gianelli* case on the sole ground of the existence in that case of a written contract to which the usage of trade term could attach.

In *Gianelli*, each of the plaintiffs, distributors of beer, and the defendant, a supplier of beer, had a written distribution contract as follows: " 'It is hereby agreed between Beck & Co., of BREMEN/GERMANY, brewers of BECK'S BEER, and _____, distributor of said beer that the said distributor is authorized to distribute BECK'S BEER under its California License(s) number _____ in the [County of] _____. Distributor's authority hereunder is non-exclusive. This agreement will continue in effect unless and until terminated at any time after January 1, 1973 by thirty days written notice by either party to the other.' " (*Bert G. Gianelli Distributing Co.* v. *Beck & Co.*, *supra*, 172 Cal.App.3d at p. 1037.)

It was undisputed that the form agreement entered into by each of the plaintiffs was a standard one-paragraph document, not a negotiated instrument.[1] Also, no terms not contained in the distributor's agreement were discussed by the parties. (*Bert G. Gianelli Distributing Co.* v. *Beck & Co.*, *supra*, 172 Cal.App.3d at p. 1038.)

---

[1]California law requires beer distributors, unlike wine distributors, to file written contracts with the state. Business and Professions Code section 25000.5 states in relevant part:

"(b) A wholesaler of beer shall not sell any brand of beer unless the following conditions are met:

"(1) The wholesaler has first entered into a written agreement, with the manufacturer of that brand, which sets forth the territorial limits within which the brand shall be distributed by the wholesaler.

Subsequently, defendant notified each plaintiff that it would terminate its agreement in 30 days. Defendant was granted its summary judgment motion on plaintiffs' subsequent lawsuit. Finding there was credible evidence the above contract was not integrated, the court determined parol evidence was admissible to demonstrate there existed an understanding of an implied-in-fact requirement of good cause for termination. It also found plaintiffs provided evidence of trade usage which could have supported a finding that termination for cause was part of the distributorship agreement. (*Bert G. Gianelli Distributing Co.* v. *Beck & Co.*, *supra*, 172 Cal.App.3d at pp. 1038-1042.)

 Wine World contends the existence of the form agreement in *Gianelli* distinguishes that case from the instant case. Specifically, Wine World argues: "Unlike the *Gianelli* plaintiffs, Brand and Varni freely admit that they never had a written or oral contract with Wine World and never even discussed the terms of their relationship with Wine World. Rather than *interpret* a written contract, appellants are attempting to use *Gianelli* in an effort to *create* an entire distribution contract with termination rights when the parties never so much as discussed a contract."

We conclude that the mere existence of an unnegotiated one-paragraph form written contract in *Gianelli* is insufficient to distinguish it so as to make it inapplicable here. Contrary to Wine World's underlying premise, there appears to be no dispute there was some form of implied-in-fact operating contractual agreement between the parties in this case. Wine World instead seems to confuse oral contracts with implied contracts.

 Witkin defines an implied contract as follows:

" 'An express contract is one, the terms of which are stated in words.' ([Civ. Code, §]1620.) 'An implied contract is one, the existence and terms of which are manifested by conduct.' ([Civ. Code, §]1621.) (See also Rest.2d, Contracts § 4 ['A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct']; 1 Corbin § 18; 1 Williston 3d § 3; 17 Am.Jur.2d, Contracts §§ 3, 4.) . . .

"The distinction between *express* and *implied in fact* contracts relates only to the *manifestation of assent*; both types are based upon the expressed or apparent intention of the parties. 'The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 11, p. 46.)

"(2) A copy of the agreement, and any amendments thereto, has been filed with the department."

 Here appellants had been distributing wine for Wine World for many years. Their course of conduct implies they had distribution agreements.[2] (Accord, *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.* (N.D. Cal. 1954) 123 F.Supp. 484, 489-490 [rejected supplier's contention the distributing contract was not a contract at all but merely an arrangement under which the plaintiff was given the privilege of distributing defendant's products].) However, because no terms were ever expressed or discussed, they were not express written or oral contracts, but rather implied contracts, the terms of which must necessarily be determined by the parties' course of conduct. Thus, the fact that no express contracts existed does not mean there were no implied contracts. If written or oral contracts did exist, there could be no implied contracts because this would be inconsistent with oral or written contracts. Where a written or oral contract exists, any implied agreement would necessarily be an implied term of such written or oral contract, as was the case in *Gianelli*. Thus, contrary to Wine World's contention, appellants are not seeking to create contracts by usage of trade. The implied distribution contracts exist, if at all, by the parties' course of conduct. Appellants only seek to establish a term of the alleged distribution agreements by usage of trade.

*Custom and Usage*

 In addition, "Usage or custom may be looked to, both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 696, p. 629; Civ. Code, § 1655.) Generally, "[u]sage can be invoked only to interpret, not create contractual terms [citations]. But a reasonable usage may supply an omitted term or otherwise supplement an agreement." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 696, p. 630.) The question here is whether usage is being used to impermissibly create a contractual term, as argued by Wine World, or whether it is being used to supply an intended but omitted term, as argued by appellants.

Certain rules have clearly emerged through case law which serve as a guide. It is clear that where a written contract states a term clearly and unambiguously, usage or custom that would vary or contradict the term is not admissible. (See, e.g., *Peiser* v. *Mettler* (1958) 50 Cal.2d 594, 610 [328 P.2d 953, 74 A.L.R.2d 1]; *Santandrea* v. *Siltec Corp.* (1976) 56 Cal.App.3d 525, 528 [128 Cal.Rptr. 629], disapproved on another point in *Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 639, fn. 8 [150 Cal.Rptr. 461, 586 P.2d 942].) Similarly, where the parties contradict each other on whether a certain term was part of a contract based on their precontract discussions,

---

[2]A trier of fact might determine no contracts existed, but the evidence certainly raises a triable issue of fact on this point.

usage or custom is not admissible to prove that one party's version of the terms of the contract was more probable. (See, e.g., *Williams* v. *Elliott* (1954) 127 Cal.App.2d 357, 364-365 [273 P.2d 953]; *Rabin* v. *Craft* (1950) 100 Cal.App.2d 808, 811 [224 P.2d 843]; *Fuqua* v. *Thomas* (1929) 96 Cal.App. 304, 305 [273 P. 1091].)

 Neither situation is present here because there is neither a written contract which expressly covers the subject of termination nor was there any discussion by the parties regarding this subject. This situation thus falls within the rule stated in *Reely* v. *Chapman* (1960) 177 Cal.App.2d 260, 263 [2 Cal.Rptr. 188], to the effect that the only theory upon which custom or usage regarding a term of a contract is admissible is where the evidence establishes there was no discussion regarding the disputed term by the parties.

It is undisputed in this case that there was no discussion regarding termination of the implied distributing contracts. Therefore, contrary to the trial court's ruling, custom and usage is admissible to prove that termination only for good cause was a term of the implied distributing agreements. While not identical to the *Gianelli* case, case law which supports the *Gianelli* decision establishes the holding of *Gianelli* is applicable here.[3]

*Duration of Contract*

 The trial court was correct in concluding that because there was no agreement that the distributing arrangements would last for a fixed term of years, the contracts were of indefinite duration, making them terminable at will under California Uniform Commercial Code section 2309 (hereafter section 2309).

Section 2309 provides in pertinent part: "(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."

In addition to the above provision, it is well established by case law that where the nature of the contract and the totality of the circumstances give no suggestion as to any ascertainable term, the term of duration shall be at least a reasonable time and the contract shall be terminable at will upon reasonable notice. (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees*

---

[3]Both parties cite numerous federal cases, none of which are particularly similar to the unique facts, procedural posture, or questions presented in this case. Each party accurately points out the distinguishing characteristics of the cases cited by the opponent, and it would serve no useful purpose to repeat them here. Instead, suffice it to say, as did the trial court, "the controlling law here is [the *Gianelli* case]."

*Union* (1968) 69 Cal.2d 713, 727 [73 Cal.Rptr. 213, 447 P.2d 325].) This rule applies, in particular, to distributorship agreements. (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union, supra,* 69 Cal.2d at p. 728; *Reely* v. *Chapman, supra,* 177 Cal.App.2d at p. 262.) Since the contracts in this case, as a matter of law, were at-will contracts, their duration was no longer or shorter than a reasonable time. They were thus in the nature of contracts renewable year to year or month to month, depending on what period may be determined to be "a reasonable time."

Contrary to the trial court's conclusion, however, this does not end the inquiry. As explained in *Gianelli,* duration of a contract and the permissible reasons for termination are different concepts. (*Bert G. Gianelli Distributing Co.* v. *Beck & Co., supra,* 172 Cal.App.3d at p. 1040.) While a contract may be indefinite in duration, thereby making it a contract at will as a matter of law, under *Gianelli* termination may nonetheless require good cause. Under *Gianelli,* a contract may continue to be indefinite in duration and at will until, for good cause or upon mutual consent, it is terminated.

As noted earlier, custom and usage is admissible to prove that termination only for good cause was a term implied in the implied distributing agreements. Appellants contend good cause is required by trade usage, and that by the application of trade usage the "unless otherwise agreed" language of section 2309 is satisfied. We will examine appellants' contentions in the following section of our discussion. We again note, however, and contrary to appellants' contention, the requirement of good cause for termination does not change the duration of the contracts. Rather, as explained above, the concepts of duration of a contract and the permissible reasons for termination are different. An at-will contract remains at will and indefinite in duration. Under section 2309, "it is valid for a reasonable time . . . ." Nonetheless, its termination may require good cause.

*Sufficiency of Evidence of Custom or Usage*

 A more difficult question is whether the evidence proffered by appellants is sufficient to raise a triable issue of fact on the question of whether trade usage supports an implied term that termination must be for good cause. The trial court held it was not (and thus inadmissible) because the evidence established any trade usage to that effect had been abandoned years prior to the time of termination of the contracts. Thus the question is whether the trade usage that existed at the time of inception of the contracts governs when at the time of the termination, that trade usage no longer exists.

The parties have cited no cases on point, and our research has disclosed none. Appellants cite two cases in support of the general rule that in contract

interpretation, courts are to give effect to the intent of the parties as it existed at the time of contracting so far as it is ascertainable and lawful. (See *Houge v. Ford* (1955) 44 Cal.2d 706, 713 [285 P.2d 257]; *Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.* (1981) 128 Cal.App.3d 583, 591 [177 Cal.Rptr. 268].) However, neither case involved implied contracts, nor did they rely on custom and usage to supply a missing term. Appellants nonetheless reason that since evidence of industry custom is admitted for the purpose of determining the parties' intent at the time of contract formation, it is the custom that existed at that time, and not when the contract was terminated, that is relevant. Thus, appellants attempt to use trade usage as both a sword and a shield.

The difficulty with appellants' argument, which certainly seems plausible, is that the nature of the instant distribution agreements does not lend itself to application of general contract principles. While it can be said the course of conduct between the parties established a contractual relationship, the nature and terms of the contracts are not spelled out. Since there was no discussion of these subjects, artificial means are necessary to determine the intent of the parties on every aspect of the contracts. The factor that most weakens appellants' argument is the lack of evidence as to the intended duration of the contracts. If, for example, the contracts were for 10 years and the trade usage changed during the course of those 10 years, it would be clear the trade usage at the time of contracting should apply if the contracts were terminated before the end of the 10 years. Similarly, if the contracts expired and identical contracts were reentered, the trade usage existing at the time of renewal, and not that existing at the time of the original contracts, should apply.

Since we have concluded the contracts in this case were at-will contracts as a matter of law, their duration was no longer or shorter than a reasonable time. They were thus in the nature of contracts renewable year to year or month to month, depending on what period may be determined to be "a reasonable time."

Viewing the contracts in this manner supports the trial court's conclusion that the trade usage at the time of the original contract formation did not apply because "if a contract can be formed by implication, it can be modified in the same way." Since any trade usage requiring termination to be for cause had ceased to exist by 1985 or 1986, if not earlier, renewal of the distributorship contracts by continued consent of the parties should not be deemed to have contained a trade usage that had previously been discarded. In other words, a contract dependent on custom to determine its terms should be flexible enough to conform to changing customs.

The evidence presented in support of and in opposition to the motions for summary judgment establishes that the custom and usage existing at the time

of the formation of the implied distributing contracts had changed or was in the process of changing three to four years before Wine World terminated the contracts in question. Good cause was no longer the standard for termination at that time. Rather, distributors were being terminated simply for purposes of consolidation. Thus, whatever may have been the custom and usage prior to 1989, it was irrelevant at the time these appellants' contracts were terminated. Applicable industry custom and usage thus does not support a conclusion that appellants' contracts were only terminable for good cause.

Similarly, there is insufficient evidence to raise a triable issue of fact regarding appellants' contention that Wine World's policies and practices were to not terminate a distributorship without good cause. As in the *Gianelli* case, appellants have presented no evidence that Wine World made any assurances regarding termination for good cause at the time of the initial contract. (*Bert G. Gianelli Distributing Co.* v. *Beck & Co., supra,* 172 Cal.App.3d at p. 1039.) Rather, as previously noted, there were no substantive discussions regarding the terms of the contract when the distributorship arrangements were first entered into. Thus, a theory of detrimental reliance is not supported. Also, while the former president of Wine World testified in his deposition that it was his practice to not terminate a distributorship agreement without good cause, this practice continued only so long as the custom in the industry had continued. Like usage of trade, this practice was discontinued by the early to mid-1980's. Thus, the requirement of good cause cannot be implied in the distributorship contracts based on Wine World's practices in light of the at-will nature of the distributorship arrangements for the reasons discussed above.

II.*

*Nonbreach Severance Compensation*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgments are affirmed. The parties shall bear their own costs on appeal.

Ardaiz, P. J., and Martin, J., concurred.

A petition for a rehearing was denied July 7, 1995, and the opinion was modified to read as printed above.

*See footnote, *ante*, page 880.