[No. B188733. Second Dist., Div. Eight. Mar. 26, 2008.]

DOMINIK UNTERBERGER et al., Plaintiffs and Appellants, v.
RED BULL NORTH AMERICA, INC., Defendant and Respondent.

**COUNSEL**

Law Offices of John F. L. Hebb and John F. L. Hebb for Plaintiffs and Appellants.

Sonnenschein Nath & Rosenthal, Michael E. Pappas and Matt Marostica for Defendant and Respondent.

**OPINION**

**COOPER, P. J.—**

## SUMMARY

A beverage distributor in St. Maarten sued a California company, alleging it had a contract for the exclusive right to distribute an energy drink in St. Maarten and adjacent islands, and that the company improperly terminated the contract without good cause. The trial court correctly granted a motion for nonsuit at the close of the distributor's case, as there was no evidence of an agreement with the California company requiring good cause for the distributor's termination. Nor was there any error in the trial court's grant of summary adjudication of the distributor's claims of fraud and intentional infliction of emotional distress in connection with the distributor's termination.

## FACTUAL AND PROCEDURAL BACKGROUND

Dominik and Sabine Unterberger own a company—Holstein Distributors N.V., doing business as Carma Importers (Carma)—that distributes beverages and other items in St. Maarten and other Caribbean islands. In 1999, the Unterbergers approached Red Bull GmbH, an Austrian company (Red Bull Austria), seeking the right to distribute its Red Bull Energy Drink in St. Maarten and nearby islands. At the time, Red Bull Austria had no distributors in the Caribbean. In July 1999, Eva Fischer of Red Bull Austria asked Unterberger for the names of the islands for which Carma would like the sole distribution rights, and Unterberger named, in addition to St. Maarten, several islands in the immediate vicinity (St. Barts, St. Eustatius, Anguilla, Saba, St. Kitts and Nevis). Fischer responded with a

fax message, stating that Carma could distribute to St. Maarten, St. Eustatius, Anguilla, Saba, St. Kitts, and Nevis. Carma began selling Red Bull Energy Drink in September 1999. Sales of Red Bull went "extremely well" in the first year.

In 2000, after about nine months of doing business with Red Bull Austria, the Unterbergers met with Eva Fischer during a trip to Germany. During that meeting, they asked her "to reconfirm our terms." According to Dominik Unterberger (Unterberger), Fischer said, " 'Listen, you guys are doing a very good job,' " and " 'Why would you, Red Bull Austria, terminate anybody who is doing such a good job?' "

On April 9, 2001, Red Bull Austria informed Carma that, due to rapid expansion to over 50 countries, it was restructuring its business, with immediate effect, so that the Caribbean and Central American countries would "now be covered by our Red Bull North America operation," which would mean increased support and faster service. "We are currently handing over all the files to the U.S. and Red Bull North America and Mr. Ed Torres [area manager for the Caribbean and Central America] will contact you in due course to set up individual business meetings and assess the current and future business with your companies."

Carma continued to distribute Red Bull Energy Drink, dealing with Red Bull North America, Inc. (RBNA). On August 28, 2001, in a memorandum advising Unterberger of a price adjustment, RBNA's area manager wrote: "Carma Importers will have selling authorization for the territory of St. Maarten and based on geographic proximity the islands of Anguilla, Saba and St. Barths only. Under no circumstances will Carma Importers entertain or engage in any sales activity outside of these areas. Any deviation in this policy will result in the immediate ceasing of shipments and prompt termination of any relationship between RBNA and Carma Importers."

Sales continued to increase in 2001 and 2002. On September 10 and 11, 2002, RBNA representatives—Markus Pichler (vice-president), Elias Dunia (the new manager for the region), Joel Jelderks (general manager for the Caribbean), and Dana Montenegro (a marketing consultant)—visited Carma's St. Maarten office for the first time (the market visit), to introduce the new area manager, assess "how things [were] going" and so on. RBNA suggested various marketing activities, and told Unterberger they thought he was doing a great job. On September 19, Dunia forwarded RBNA's report on the market visit, for Unterberger's review and comment. Under "main issues," the report listed the current inventory, distribution levels, sales volume and unit prices, and also stated the following:

—"No significant RB marketing activity, except for some radio support in the island, in the past year," and

—"Carma has no distribution contract, only a letter of agreement with RB Austria from 1999."

The report then listed 11 "next steps," including an evaluation of the sales potential for the remainder of the year and determining a 2003 forecast; developing a promotional support program and a one-year plan for 2003; and a "special offer of 1 free case in 10" from September 16 to December 1. The "next steps" also included: "Distribution contract to be produced after legal consultation by RBNA," and "Additional coverage to islands such as Anguilla, St. Barts, Antigua, Nevis, St. Kitts, Saba to be considered."

Unterberger responded to RBNA's report, stating in an e-mail to Dunia on September 23 that "there are a few things that we would like to add." Among these items was: "The importance of Carma Importers receiving a proper contract is based primarily on the situation at hand. After we reestablish ourselves it is imperative that we have the surrounding Islands assigned to us 'Officially.' "[1] Dunia's response on September 30 stated they would "work out a plan together to address support needs for future development in the market," and that "Marcus is working on the contract documents and will advise us all as soon as they are ready."

No contract documents were forthcoming, however. According to Unterberger, Carma immediately began working on the "next steps," but, except for providing the "1 free case in 10" deal, RBNA performed none of the "next steps" to which it had agreed. Within a few weeks, Dunia began to discourage Unterberger with "[n]egative letters."[2] When Unterberger persuaded the sponsor of the Heineken Regatta, a big event in St. Maarten, to

---

[1] Unterberger testified that RBNA did not ever give him any proposed written distribution contracts, and that he did not have any idea "what their contract would look like."

[2] On October 7, Dunia told Unterberger he would make a followup visit on October 28, and Unterberger should "work out a plan on how you will develop [Red Bull] in the current assigned markets." Dunia's e-mail also said, "Let's develop a plan to generate more distribution and presence in your markets." On December 7, Dunia told Unterberger, "Your main concern should be increased distribution in the island." In response to a January 24, 2003 letter from Dunia expressing the same concern, Unterberger wrote to Dunia. Unterberger's January 27 e-mail included the statement, "During the first [September 2002] visit Markus was very surprised to hear that we did not have any form of Contract, and had agreed that we should definitely work on getting one for Carma Importers. During our last telephone conversation (22/Jan/03), your point of view was only 'you're not going to sell any more product with a contract.' " Dunia's responding e-mail, also on January 27, repeated his concern about the distribution issue and also stated: "My comment on the phone, when you asked about the contract was exactly this " 'is a contract going to make you a more aggressive distributor or get us significant additional penetration'?" On February 27, 2003, Dunia told Unterberger that

allow Carma to work with them, Dunia said that " '[Carma's] work does not justify any amount of—any amount of sponsoring.' "

Eventually, on March 11, 2003, RBNA terminated its business relationship with Carma. In June 2003, Unterberger wrote a letter to Red Bull Austria, seeking an appointment during an upcoming trip to Germany, "to find out the actual reasons for the decision made." In recounting the history of its dealings with Red Bull Austria and RBNA, Unterberger observed that everything was going very well after the September 2002 market visit, "until we inquired when we were to finally receive our long awaited contract. (Red Bull Austria was always reluctant to give us a contract due to the upcoming change over to Red Bull North America)."

On March 8, 2004, the Unterbergers and Carma sued RBNA for breach of contract and multiple other causes of action.[3] RBNA obtained summary adjudication in its favor of many of the claims, including those for fraud and intentional infliction of emotional distress. The parties went to trial on Carma's claims for breach of contract. At the close of Carma's case-in-chief, the trial court granted RBNA's motion for nonsuit under Code of Civil Procedure section 581c, finding there was "no evidence of a contract between [Carma] and Red Bull GmbH or an assignment to Red Bull North America."

Judgment was entered in RBNA's favor on March 16, 2006. The earlier notice of appeal filed by Carma and the Unterbergers is treated as having been filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(e).)

## DISCUSSION

### A. *The trial court did not err in granting RBNA's motion for nonsuit.*

Carma contends it had a contract with Red Bull Austria—partly written, partly oral, and partly implied by conduct—for the exclusive right to distribute Red Bull Energy Drink in St. Maarten and neighboring islands, and that the contract could not be terminated without good cause.[4] Carma further

---

"[a] market review has been made and alternatives are being considered for future development." On March 6, 2003, RBNA told Carma its account with Red Bull had to be current before Red Bull would release any further product from Miami to Carma, and RBNA would no longer accept partial payment for containers.

[3] They also sued Red Bull Austria, but dismissed it from the case on November 16, 2004.

[4] One written portion of the alleged contract was Eva Fischer's July 12, 1999 fax stating that Carma could distribute to St. Maarten and several other islands. This fax, trial exhibit 7, was not moved or admitted into evidence at the trial, an omission which appears to have been

contends Red Bull Austria assigned its contract to RBNA, and RBNA further expanded the contract by agreements made during the September 2002 market visit and reduced to writing in RBNA's report on the market visit.[5] Carma claims RBNA breached the contract when it terminated its relationship with Carma on March 11, 2003, because it had no good cause to do so.

Essential to Carma's claim is evidence (1) that the arrangement between Red Bull Austria and Carma was not terminable at will, but instead could be terminated only for good cause, and (2) that RBNA assumed the obligations of Red Bull Austria's contract with Carma, including the alleged oral promise that Carma would be terminated only for good cause. Carma's claim fails, because it presented no evidence from which a jury could draw a conclusion favorable to Carma on either point.

■ First, it has been held that, where there was no agreement that distributing arrangements would last for a fixed term of years, such contracts "were of indefinite duration, making them terminable at will under California Uniform Commercial Code section 2309 . . . ." (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 890 [41 Cal.Rptr.2d 740]; Cal. U. Com. Code, § 2309, subd. (2) ["[w]here the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party"].) Carma argues there was evidence it was "otherwise agreed" that Red Bull Austria could not terminate its arrangement with Carma without good cause. The only evidence Carma identifies of such an agreement by Red Bull Austria was Eva Fischer's comment, when Unterberger asked her "to reconfirm our terms," that " 'Why would . . . Red Bull Austria, terminate anybody who is doing such a good job?' " A rhetorical comment such as Fischer's, however, simply is not sufficient evidence that Red Bull Austria intended to agree that the arrangement with Carma could not be terminated except for good cause.[6] (See *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 [71 Cal.Rptr.2d 265] [every contract requires mutual

inadvertent. Carma filed a motion under rule 8.224(c) of the California Rules of Court for permission to transmit exhibits to this court, including exhibit 7. RBNA opposed the motion, saying it had no opportunity to object in the trial court, and that the letter "may have been subject to objections" on several bases. But the letter was identified at trial, Unterberger testified about it, and RBNA does not assert it actually would have been inadmissible. We grant Carma's motion; in view of our disposition of the case, there is no prejudice to RBNA in our consideration of exhibit 7.

[5] Unterberger testified that Carma did not have any form of written contract with RBNA, other than the letter agreement with Red Bull Austria it claimed was assigned to RBNA.

[6] Under questioning by his attorney, Unterberger testified that, except for Fischer's remark at the meeting in Germany in 2000, no one at Red Bull Austria or RBNA told him "anything at all about the duration of [Carma's] contract," and after the transfer to RBNA, no one at RBNA told him "anything at all about the duration of [Carma's] contract with Red Bull North America."

consent, and consent is not mutual " 'unless the parties all agree upon the same thing in the same sense' "; the test is " 'what the outward manifestations of consent would lead a reasonable person to believe' "]; cf. *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 345 [100 Cal.Rptr.2d 352, 8 P.3d 1089] ["brief and vague statement" by a single Bechtel official that Bechtel terminated workers only with good reason was insufficient as a matter of law to permit a finding that the company had contracted away its right to discharge employee at will].) Indeed, Unterberger's own letter to Red Bull Austria, after Carma's termination by RBNA, showed Red Bull Austria's reluctance to give any kind of contract to Carma: "(Red Bull Austria was always reluctant to give us a contract due to the upcoming change over to Red Bull North America)." In short, even if a contract existed between Red Bull Austria and Carma, there is no evidence the parties agreed it could not be terminated except for good cause.

Second, even if we assume Eva Fischer's comment somehow bound Red Bull Austria to continue to use Carma as its exclusive distributor unless it had good cause for terminating the relationship, there is no evidence whatsoever that RBNA assumed that obligation. Indeed, there is no evidence RBNA even knew of Red Bull Austria's supposed obligation not to terminate its relationship with Carma without good cause. *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265 [87 Cal.Rptr.2d 497] (*Heppler*) is instructive on the point. "An assignment of rights under an executory contract does not impose upon the assignee the obligations of the assignor under the contract unless the assignee assumes these obligations." (*Id.* at p. 1289.) While an assumption of obligations may be implied from the acceptance of benefits under a contract, that is so only "so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589; see *Heppler, supra*, 73 Cal.App.4th at p. 1290 ["[i]n determining whether there has been an assumption of the obligations from an assignment of rights, a court looks to the intent of the parties as indicated by their acts, the subject matter of the contract, or their words"].) In short, even if we assume that the transfer of Red Bull Austria's files to RBNA effected an assignment to RBNA of the arrangements with Carma, there is no evidence RBNA knew of any obligation on Red Bull Austria's part not to terminate Carma without good cause. Accordingly, RBNA could not have assumed any such obligation.

In sum, the evidence presented in Carma's case-in-chief was insufficient to establish any contractual obligation on RBNA's part not to terminate its business arrangements with Carma without good cause.[7] Consequently, the trial court did not err in granting RBNA's motion for nonsuit.

---

[7] Carma also asserts a separate cause of action for breach of the credit terms of its contract when, a week or so before Carma's termination, RBNA insisted on full payment for containers of Red Bull Energy Drink, rather than the previous 50 percent payment in advance and 50

B. *The trial court did not err in summarily adjudicating the claims of fraud and intentional infliction of emotional distress.*

Carma and the Unterbergers also argue the trial court erred when it summarily adjudicated the causes of action alleging fraud and intentional infliction of emotional distress. There was no error.

The complaint alleged that RBNA "hid and concealed" its activities and expansion plans from Carma; "gave false and misleading information" to Carma to induce Carma to garner additional business for RBNA's future benefit; Carma "justifiably relied on defendants' deceptions and misrepresentations to [Carma's] detriment—just as [RBNA] intended and knew [Carma] would." In opposition to RBNA's summary adjudication motion, Carma cited as evidence the declaration of Dominik Unterberger, "especially item 3." Unterberger's declaration stated that:

—Within 10 days of the September 2002 market visit, RBNA "signaled to [Carma] its possible unwillingness to perform, then over the next approximate four months gave conflicting information to [Carma] as it refused to perform as promised . . . ."

—RBNA "misled [Carma] into thinking that their continued performance would resolve any conflicting input from [RBNA]"; RBNA's "true intent to terminate the contract had already been made in October 2002, and . . . thereafter until its formal termination in March 2003, [RBNA] affirmatively gave false and misleading information and responses to [Carma] on which [Carma] justifiably relied to their detriment."

—Unterberger asked Joel Jelderks in February 2003 whether there was any intention to discontinue Carma's contract, because Carma was "about to close the purchase transaction on a truck to be used in the Red Bull Business, and that it was not too late to cancel that transaction; Jelderks replied, no, no problem, go ahead with the purchase."

The trial court concluded Carma's fraud allegations were merely a restatement of its breach of contract claims, and stated: ". . . I don't believe that any evidence has been presented to allow the conclusion that fraud was perpetrated on anyone. Plaintiffs really were unable to find any cognizable basis for

---

percent in 60 days. However, Unterberger himself testified that no one at Red Bull Austria or RBNA ever promised him that those credit terms would never be revoked. Moreover, Carma cannot establish damages; it paid in advance for a container, which RBNA did not ship, but RBNA returned that payment and also paid the bank charges of $500 or $600 associated with the transaction.

the claim and I think Mr. Unterberger's declaration had many conclusory arguments and legal conclusion presented therein, and that is not enough to raise a triable issue."

■ We agree with the trial court. To avoid summary adjudication of its fraud claim, Carma was required to produce evidence of (1) a misrepresentation, (2) knowledge of falsity (or "scienter"), (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance, and (5) resulting damage. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 772, p. 1121.) But Unterberger's declaration—the only evidence Carma produced—identifies no specific misrepresentations of fact, no evidence of knowing falsity of any particular statement, and no evidence of intent to defraud. Unterberger's declaration is merely a series of conclusory allegations without the specificity necessary to survive a demurrer, much less raise triable issues of fact. (Cf. *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347 [134 Cal.Rptr. 375, 556 P.2d 737] [mere conclusionary allegations that omissions were intentional and for the purpose of defrauding plaintiffs and bringing about a purchase of stock and that plaintiffs relied on the omissions in making the purchase were insufficient to state a claim for fraud].) The claim is merely a breach of contract claim dressed in the language of fraud.

■ The trial court likewise correctly granted summary adjudication of the Unterbergers' cause of action for intentional infliction of emotional distress. The Unterbergers claimed that RBNA's "change in credit terms to bring extreme financial pressure on plaintiffs to quit, and then refusing to ship the paid for product anyway, meaning we obviously would not be able to service our customers even though we arranged costly emergency financing, would necessarily and naturally result in emotional distress to the intended victims . . . ." However, a cause of action for intentional infliction of emotional distress arises when a defendant "intentionally or recklessly causes 'severe emotional distress' to another by 'extreme and outrageous conduct.' " (5 Witkin, Summary of Cal. Law, *supra*, § 450, p. 668, quoting Rest.2d, Torts § 46.) "To be 'outrageous,' conduct 'must be so extreme as to exceed all bounds of that usually tolerated in a civilized community' " (*Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 44 [241 Cal.Rptr. 539]), and the court is to determine, in the first instance, whether conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. (*Ibid.*) On this record, we find it impossible to disagree with the trial court's conclusion, namely: "[T]he conduct that plaintiffs allege caused them distress, i.e., the termination of a business relationship, is, as [a] matter of law, not the type of 'outrageous' conduct that is required to support a cause of action for intentional infliction of emotional distress."

## DISPOSITION

The judgment is affirmed. Red Bull North America, Inc., is to recover its costs on appeal.

Flier, J., and Egerton, J.,* concurred.

A petition for a rehearing was denied April 24, 2008, and appellants' petition for review by the Supreme Court was denied August 13, 2008, S164118.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.