Filed 1/29/16  Basic Your Best Buy v. DirectTV CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| BASIC YOUR BEST BUY, INC., | B258061 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC467034) |
| v. | |
| DIRECTV, INC., | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

Kesselman Brantly Stockinger, David Wayne Kesselman; Crowell & Moring, Gregory D. Call, Michael Y. Kao, and Daniel A. Sasse for Plaintiff and Appellant.

Quinn Emanuel Urquhart & Sullivan, Michael E. Williams and Justin C. Griffin for Defendant and Respondent.

Plaintiff and appellant Basic Your Best Buy, Inc. (Basic) appeals a judgment following a grant of summary judgment in favor of defendant and respondent DirecTV, Inc. (DirecTV).

Basic was an authorized retailer for DirecTV. After DirecTV terminated Basic's contract, DirecTV allegedly precluded other retailers from bidding for Basic's sales leads, and then purchased Basic's sales leads at a depressed price.

The essential issue presented is whether there exists a triable issue of material fact with respect to Basic's cause of action against DirecTV for violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[1] We conclude that Basic failed to raise a triable issue of material fact as to either a horizontal or vertical restraint. Basic's horizontal restraint fails because Basic failed to present evidence of an agreement among horizontal competitors not to bid for Basic's sales leads. Basic's vertical restraint theory fails because Basic failed to meet its burden to define the relevant market. Therefore, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

1. *The parties.*

DirecTV provides satellite entertainment programming to over 20 million customers throughout the United States, in competition with cable providers, other satellite providers, and telecommunications companies. DirecTV markets its programming directly to consumers. It also sells programming to consumers through a network of authorized retailers, including stores such as Best Buy and Costco, telecommunications companies and authorized independent retailers such as Basic.

---

[1] All further statutory references are to the Business and Professions Code, unless otherwise specified.

[2] This matter was the subject of a prior decision by this court, *Basic Your Best Buy, Inc. v. DirecTV, Inc*. (Oct. 5, 2012, B236383 [nonpub. opn.]), which affirmed an order denying DirecTV's special motion to strike Basic's complaint.

Basic was a DirecTV authorized retailer from 1996 until December 2008. Basic specialized in signing up customers through advertisements in telephone directories. Because consumers often retain telephone directories for years, Basic's ads would continue to generate sales leads for DirecTV several years after they were placed.

2. *The agreements governing the relationship between DirecTV and Basic.*

The relationship between DirecTV and Basic was governed by DirecTV's standard Independent Retailer Agreement and Customer Referral Agreement.

Pursuant to the agreements, Basic was required to use marketing tactics, channels and methods designated by DirecTV, which retained "sole and absolute discretion" to withhold approval of the use by retailer of "any marketing tactic, channel or method that DIRECTV reasonably believes does not fit within its marketing strategy."

The agreements prohibited the sharing of compensation among retailers, stating: "Company shall not rebate or share any Compensation with another contractor/retailer of DIRECTV, or any other party (whether or not an authorized contractor/retailer of DIRECTV."

The agreements included a termination clause which provided "that due to the relatively unpredictable nature of the multi-channel video/entertainment service business, . . . either party may terminate this Agreement at any time for any or no cause, reason or justification, upon at least thirty (30) days' prior written notice to the other stating its intention to terminate. THE PARTIES ACKNOWLEDGE AND ACCEPT THE RISK INHERENT IN THE FOREGOING PROVISION."

Further, upon termination, a retailer must "immediately discontinue all advertising, marketing, solicitation of lease and promotion [of DIRECTV services] and shall cease to identify itself as an authorized [retailer] for DIRECTV or otherwise affiliated in any manner with DIRECTV."

The agreements also addressed what would occur after termination. Both parties were subject to a mutual "Waiver of Claims" provision that stated: "EACH PARTY WAIVES ANY RIGHT TO COMPENSATION AND DAMAGES IN CONNECTION WITH THE TERMINATION [including] PAYMENT FROM DIRECTV FOR LOST BUSINESS, FUTURE PROFITS, LOSS OF GOODWILL, REIMBURSEMENT OF EXPENDITURES OR

3

INVESTMENTS MADE OR COMMITMENTS ENTERED INTO, ADVERTISING COSTS, OVERHEAD OR OTHER COSTS . . . ."

3. *Basic's termination as an authorized retailer.*

DirecTV recognized that directory listings by numerous retailers resulted in multiple listings for DirecTV that were duplicative and caused customer confusion. As a result, in March 2007, DirecTV issued a policy prohibiting retailers from placing new ads in telephone directories without DirecTV's prior approval.

Basic was exempted from the limitation and was approved to continue placing new directory advertisements. One other retailer, Direct Sat TV, also was approved to place directory ads. In addition, DirecTV set up a central buying desk, through which other authorized retailers could place directory listings.

Basic continued as an authorized retailer for another year. Then, on November 4, 2008, DirecTV notified Basic that it was exercising its right to terminate Basic's sales agency agreement and customer referral agreement on 30 days written notice, and that the agreements would be terminated effective December 4, 2008.

Following termination, Basic allegedly spent an additional $2.7 million for ads to which it had already committed before its termination. Basic wanted to recoup that outlay. Basic also wanted to monetize the value of its directory ads, which would continue to generate consumer inquiries and new sales for a period of time.

DirecTV advised Basic that it was interested in purchasing Basic's sales leads. Other authorized retailers, such as Satex, Cannon Satellite, and Expert Satellite, also expressed an interest in buying Basic's sales leads, but did not bid, mindful that they were not authorized to sell in this channel without DirecTV's approval. At least two authorized retailers, Expert Satellite and Satex, requested DirecTV's approval to bid on Basic's assets, which DirecTV refused. However, the only company in the same distribution channel as Basic was Direct Sat TV, and it did not seek DirecTV's approval to bid on Basic's sales leads.

4

Without any other potential buyers, on December 3, 2008, Basic entered into an agreement to sell its sales leads to DirecTV, for compensation of $157.50 for each new DirecTV subscriber referred through Basic's toll free numbers between December 16, 2008 and September 30, 2010. DirecTV paid Basic more than $3 million pursuant to the post-termination agreement.

4. *Proceedings*.

a. *Pleadings*.

On August 5, 2011, Basic brought suit against DirecTV, alleging a single cause of action for conspiracy in restraint of trade in violation of the Cartwright Act (§ 16700 et seq.). Basic alleged that DirecTV conspired in restraint of trade to restrict competition in bidding for its sales leads. Basic pled that DirecTV "told its [authorized dealers] that they could not bid for another [authorized dealer's] assets without first receiving express permission from DirecTV." Basic alleged that DirecTV "strongly suggested" to its dealers that they would be terminated if they bid for such assets without DirecTV's approval. Basic further alleged that the authorized dealers "knew that they should not bid for other [dealers'] assets if DirecTV was bidding for those same assets." As a result, Basic alleged, competition for its assets was improperly restricted, causing Basic to receive nearly $30 million less than it would have but for DirecTV's restraint of trade.

b. *DirecTV's motion for summary judgment*.

On March 26, 2014, DirecTV filed a motion for summary judgment, contending Basic could not establish that DirecTV's contractual restrictions on its retailer network were an unlawful restraint of trade, as vertical restraints on intrabrand competition are permissible under the Cartwright Act unless a plaintiff can prove they have an anticompetitive purpose and a harmful effect on interbrand competition, and Basic lacked evidence of either element. Further, Basic could not establish antitrust injury, which requires a showing of injury to competition, not just competitors. Basic could not establish that DirecTV's reminder to its retailers of their contractual restrictions constituted an unlawful conspiracy under the Cartwright Act. In addition, Basic failed to

5

meet its burden of establishing a relevant market because its expert admittedly did not conduct the necessary market analysis. Also, Basic's "monopsony" theory of liability that DirecTV paid a below market price to Basic only to sign up fewer customers was illogical and legally unsupported. Finally, DirecTV's conduct in protecting its trademarks is immune from antitrust liability.

In opposition, Basic argued the conduct at issue here was unlawful per se under the Cartwright Act because it was a horizontal conspiracy among competitors (DirecTV and other authorized retailers) that prevented other retailers from bidding on Basic's sales leads. However, even assuming this restraint was subject to the rule of reason, summary judgment was inappropriate because the anticompetitive harm resulting from DirecTV's coerced agreement greatly outweighed any alleged procompetitive effects.

c. *Basic's motion for summary adjudication.*

Basic concurrently filed a motion for summary adjudication directed at five of DirecTV's affirmative defenses, wherein DirecTV pled: its conduct was a lawful and justified means to accomplish legitimate business objectives (4th affirmative defense); constituted fair competition (21st affirmative defense); was a valid exercise of its trademark rights and obligations (22nd affirmative defense); was not taken for purpose of restraining trade (25th affirmative defense); and Basic had no right to engage in the unlawful conduct that DirecTV allegedly prevented it from engaging in (24th affirmative defense).

d. *Trial court's ruling.*

On May 16, 2014, after having heard the matter and having taken it under submission, the trial court issued a 13-page ruling granting DirecTV's motion for summary judgment and denying Basic's motion for summary adjudication.

The trial court ruled, inter alia: "A horizontal restraint is an agreement imposed by competitors at the same level of the market to minimize or eliminate competition. Here, defendant [DirecTV] was not in competition with independent retailers that defendant contracted with to market and promote defendant's products and services on

6

defendant's behalf.  Simply because defendant also engaged in such activities on its own behalf does not transform the parties into competitors."

The trial court also rejected Basic's contention that even if DirecTV's conduct were considered to be vertical, it was nevertheless per se illegal under the Cartwright Act.  "Plaintiff appears to be arguing that the 'rule of reason' does not apply here and that because 'naked price-fixing' is at issue here, the *per se* rule applies."  The trial court found, "It is clear that [a] vertical price-fixing agreement is not at issue in this case.  At issue are defendant's contractual  restrictions regarding the use of approved marketing tactics and trademarks.  Plaintiff did not allege that defendant and its retailers conspired to set any price or solicit any agreement with anyone regarding the price it paid to plaintiff.  [¶]  From the foregoing, it is clear that defendant's conduct is not *per se* illegal under the Cartwright Act."

Further, under the rule of reason, Basic had the burden to make a showing of a substantially adverse effect on competition in the relevant market.  "In this case, plaintiff's expert failed to establish a relevant market.  Plaintiff's expert did no analysis to determine what market definition should be applied in this case.  (SSUF 45-47.) . . . . While it is true that there is generally a greater reluctance to uphold a grant of summary judgment when the rule of reason is the appropriate standard[,] . . . it is also true that where there exists no tenable *per se* boycott theory appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . . and consequently to survive a summary judgment motion."  (Internal quotations omitted.)

Basic filed a timely notice of appeal from the judgment.

### CONTENTS

Basic contends:  it suffered antitrust injury and thus has standing to pursue a claim under the Cartwright Act; the coerced agreement is a horizontal restraint in the market for sales leads that is per se unlawful; even if the rule of reason applies, summary judgment in favor of DirecTV was improper; and the trial court abused its discretion in excluding competent and relevant evidence.

7

**DISCUSSION**

1. *No merit to Basic's contention the alleged coerced agreement to suppress competition to buy Basic's sales leads was a horizontal restraint in the market for sales leads that is per se unlawful; the alleged restraint was vertical, not horizontal.*

  a. *General principles.*

"The Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), like the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade. Restraint of trade may be horizontal or vertical. 'Contracts, combinations and conspiracies in restraint of trade covered by Section 1 of the Sherman Act are of two types, horizontal or vertical. Horizontal combinations are cartels or agreements among competitors which restrain competition among enterprises at the same level of distribution. They are ordinarily illegal per se. [Citations.] Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained. Vertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail. [Citations.]" (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680-1681, fn. omitted (*Exxon*); see *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1164 [judicial interpretation of Sherman Act helpful but not directly probative of Cartwright drafters' intent].)

  b. *Basic's horizontal restraint theory.*

Basic's theory in this regard is that there existed a coerced agreement between DirecTV and authorized retailers not to bid on Basic's sales leads which was a horizontal agreement in restraint of trade, and therefore constituted a per se violation of the Cartwright Act. According to Basic, DirecTV and the other authorized retailers were horizontal competitors in the market for the purchase of DirecTV sales leads, and

8

competed with each other to acquire sales leads generated by third parties, including the sales leads generated by Basic's directory ads.

In opposition, DirecTV argues that its restrictions on its retailers were clearly vertical, as they are imposed by DirecTV, an enterprise further up the chain of distribution. (*Exxon*, *supra*, 51 Cal.App.4th at p. 1680.)

The trial court rejected Basic's horizontal restraint theory, stating: "A horizontal restraint is an agreement imposed by competitors at the same level of the market to minimize or eliminate competition. Here, defendant was not in competition with independent retailers that defendant contracted with to market and promote defendant's products and services on defendant's behalf. Simply because defendant also engaged in such activities on its own behalf does not transform the parties into competitors."

c. *Standard of review*.

"Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment. [Citation.]" (*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.* (1st Cir. 2004) 373 F.3d 57, 61.)[3]

d. *Relevant case law supports trial court's characterization of the alleged restraint as vertical, not horizontal*.

In a horizontal group boycott, "entities *at the same level* combin[e] to deny a competitor at their level the benefits enjoyed by the members of the group," jointly disadvantaging the competitor. (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 195, fn. 26, italics added.) Here, DirecTV was not at the same level as the other authorized retailers who were potential bidders for Basic's sales leads. DirecTV is an entity at the *manufacturer level*. Therefore, this is not a case in which horizontal competitors combined to undermine a competitor.

---

[3] At oral argument, Basic acknowledged that this court can decide as a matter of law that the per se rule applies.

Nonetheless, Basic contends the fact that pressure is applied vertically does not transform an otherwise horizontal restraint into a vertical one. Basic argues that irrespective of the fact that DirecTV used vertical leverage, the antitrust violation at issue is a horizontal restraint – a coerced agreement between DirecTV and DirecTV's competitors for Basic's sales leads that they would not bid for Basic's sales leads – which was achieved through vertical coercion.

Per se "violations have been found in several cases involving ostensibly 'vertical' restrictions that were determined to be 'primarily horizontal in nature.' Thus, in *Cernuto, Inc. v. United Cabinet Corp*. [(3d Cir. 1979)] 595 F.2d 164, where a manufacturer terminated a price cutting retailer at the behest of the retailer's competitor, allegedly because of price considerations, the Court of Appeals stated that '[*i*]*f the action of a manufacturer . . . is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition . . . .*' (*Id*., at p. 168.) The [*Cernuto*] court ruled that sufficient facts had been alleged to support a per se violation. The *Cernuto* court emphasized that the motivating factor in the alleged conspiracy was price, i.e., the conspiracy sought to protect the existing retailer from price competition of a discounter. [Citations.]" (*Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1045-1046, italics added (*Gianelli*), disapproved on another point in *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 394, fn. 2.)

Similarly, "in *Com-Tel, Inc. v. DuKane Corp*. (6th Cir. 1982) 669 F.2d 404, the plaintiff was effectively rendered unable to perform a work project for which it had successfully bid because a combination *initiated by a competitor and involving the manufacturer of equipment* specified in the bid specifications prevented it from obtaining the necessary equipment. Although the coercive pressure was applied vertically, by the manufacturer, the court concluded 'that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott.' (*Id*., at p. 409.)" (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1046, italics added.)

*Gianelli* explained, "In order to sustain a group boycott theory of per se illegality with respect to restraints that are vertically imposed, there must be a showing that the restraint imposed by the manufacturer *was not only conceived of and initiated by those in direct competition with the plaintiff, but that those competitors used their economic power or position to influence the manufacturer to act, not for its own advantage, but solely for the advantage of those competitors.*" (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1047, italics added.)

*Gianelli* found no such showing on the facts presented. There, Beck's, a beer manufacturer, was sued by various local beer wholesalers who were terminated as distributors. (*Id*. at p. 1030.) Rejecting a group boycott theory, *Gianelli* explained, "[e]ven indulging the assumption that the restraint imposed by Beck's was prompted by complaints from plaintiffs' competitors, there is no evidence that Beck's was compelled to act on those complaints because of an exertion of economic power. *Nor is there evidence that Beck's acted solely or even primarily for the benefit of plaintiffs' competitors rather than for its own benefit.* Finally, and perhaps most significantly, there is no evidence that the challenged restraint had any "pernicious effect on competition and lacked any redeeming virtue." (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1047, italics added.)

Other cases illustrate the nature of a group boycott. "In [*United States v. General Motors Corp*. (1966) 384 U.S. 127 (*General Motors*)] the Supreme Court found a group boycott where a group of automobile dealers had joined together to force their manufacturer, General Motors, to assist them in ending the practice of some dealers that were reselling their automobiles to discounters. See *id*. at 143-44, 147. Other cases fit this mold as well. See, e.g., *Big Apple BMW* [*Inc. v. BMW of N. Am. Inc*. (3rd Cir. 1992)] 974 F.2d [1358,] 1376 (analyzing an alleged agreement among supplier BMW North America and several of its dealers to prevent a potential price-cutting competitor from receiving a franchise as a horizontal group boycott); [*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc*. (3rd Cir. 1980)] 637 F.2d [105,] 114 (holding that when a manufacturer

11

terminates a distributor's supply pursuant to an agreement with several distributors, these actions make out a horizontal § 1 claim); cf. *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (applying a similar horizontal analysis under § 2 of the Sherman Act where manufacturers and distributors had conspired among themselves and with a major retailer to deprive another retailer access to product lines).  [¶]  The common principle we glean from these cases is that *a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies.* " (*Rossi v. Standard Roofing, Inc.* (3rd Cir. 1998) 156 F.3d 452, 462, italics added.)

In the instant case, we are dealing with alleged coercion by DirecTV, which directed other retailers not to bid on Basic's sales leads.  The above cases are instructive. DirecTV allegedly precluded other potential bidders from purchasing Basic's sales leads in order to suppress the price it would have to pay to acquire those leads.  However, "[i]n order to sustain a group boycott theory of per se illegality with respect to restraints that are vertically imposed, there must be a showing that the restraint imposed by the manufacturer [i.e. DirecTV] *was not only conceived of and initiated by those in direct competition with the plaintiff, but that those competitors used their economic power or position to influence the manufacturer to act, not for its own advantage, but solely for the advantage of those competitors.*" (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1047, italics added.)

Here, the alleged restraint was not conceived of and initiated by those in direct competition with Basic; rather, the alleged restraint was vertical in nature in that it was conceived of and imposed by DirecTV, at the manufacturer level, for DirecTV's own benefit.

In reliance on *Guild Wineries & Distilleries v. J. Sosnick & Son* (1980) 102 Cal.App.3d 627 (*Guild*), Basic contends that a price fixing restraint imposed by a dual distributor such as DirecTV, that advantages it against other distributors with whom

12

it competes, is regarded as horizontal, and thus a per se violation of the Cartwright Act. *Guild* is unavailing to Basic. In *Guild*, a wine cooperative terminated a wholesaler's distributorship contract after the wholesaler refused to turn over a lucrative account to it. (*Id*. at pp. 630-631.) Thus, in *Guild*, the impetus for the restraint came from a dual distributor that was in direct competition with the terminated distributor at the horizontal level. In contrast, in the instant case, DirecTV was not a competitor of Basic in the market for sales leads -- rather, DirecTV was an enterprise further up the chain of distribution imposing a restraint which was vertical in nature.

Further, although DirecTV was a dual distributor of satellite entertainment programming, there was no evidence of any agreement between DirecTV and any direct competitor of Basic with respect to Basic's sales leads. The evidence showed that Direct Sat TV was the sole company in the same distribution channel as Basic --  Direct Sat TV was the only other authorized retailer which had been approved by DirecTV to place directory ads. However, Basic did not present any evidence of an agreement between Direct Sat TV and DirecTV that Direct Sat TV would not bid on Basic's sales leads. Direct Sat TV was not even one of the retailers which approached DirecTV for approval to buy Basic's sales leads. Therefore, there is no evidence of a horizontal agreement conceived of by Direct Sat TV, Basic's sole direct competitor.

Basic views the class of competitors for its sales leads more broadly. Basic recognizes that the agreements with DirecTV restricted retailers to specified marketing channels, but it contends the agreements did not place any limitation on the handling of sales leads *once they were generated.* According to Basic, the agreements did not restrict a retailer's right to sell or transfer its leads to other retailers, including after termination of the retailer's contract, and as a result, a market developed in which retailers bought and sold leads from each other, former retailers and affiliates. Thus, under Basic's theory, the potential bidders for its sales leads were not limited to a company in the same marketing channel as Basic.

13

Basic's attempt to enlarge the class of horizontal competitors beyond Direct Sat TV is unpersuasive. As indicated, DirecTV's March 2007 notification of its policy reminded its authorized retailers that DirecTV "may withhold approval in its sole and absolute discretion of the use by a DIRECTV retailer of any marketing tactic, channel or method that DIRECTV reasonably believes does not fit within its marketing strategy," and that DirecTV was exercising its rights, "effective as of March 1, 2007," to prohibit other retailers from "utiliz[ing] a directory listing (whether in print, on-line or otherwise) in connection with [their] activities as a DIRECTV retailer." Thus, the March 2007 notice reiterated DirecTV's right to control the marketing channel in which its retailers would operate, and prohibited those other retailers from "*utilizing*" directory listings. The word "utilize" means "to put to use; turn to profitable account." (http://dictionary.reference.com/browse/utilize?s=t) Accordingly, this advisement by DirecTV negates Basic's argument that there was no restriction on other retailers *receiving* calls generated by directory ads. Moreover, Basic's argument disregards the express language in the agreements barring the sharing of compensation among retailers. Given the contractual prohibition on sharing of compensation among retailers, Basic's theory the agreements did not restrict its right to sell or transfer leads to other retailers is clearly without merit. Basic has not shown that DirecTV had any obligation to permit other retailers to enter the marketing channel of telephone directories so as to enable them to bid on Basic's sales leads.

The fact that retailers had bought and sold sales leads from each other in the past is insufficient to raise a triable issue in this regard. Further, although Basic asserts that terminated dealers routinely sold their leads to other retailers, Basic has not shown that other retailers were allowed to sell outside their authorized distribution channels following the March 2007 directory listings policy. Moreover, as for retailers who bought and sold sales leads among themselves, Basic has not shown the content of the agreements governing those retailers, or whether those retailers needed and obtained DirecTV's approval for those transactions. Basic's showing, without more, that sales

14

leads were transferred among retailers, is insufficient to raise a triable issue with respect to a horizontal conspiracy involving DirecTV and other retailers, such as Expert Satellite and Satex, entities which were outside the marketing channel of telephone directories.

Based on the uncontroverted evidence, the conduct in issue is properly characterized as a vertical, rather than a horizontal, restraint. Having determined the alleged restraint is vertical, we now address whether Basic raised a triable issue of material fact with respect to a vertical restraint of trade.

2. *Basic failed to present evidence of a relevant market and therefore failed to raise a triable issue of material fact under the rule of reason governing vertical restraints.*

A plaintiff alleging a vertical restraint of trade under the Cartwright Act has the initial burden " 'to delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.' [Citation.]" (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 542.)

a. *Basic's definition of the relevant market.*

Basic defines the relevant market as the market for DirecTV sales leads. The declaration of its economist, Ronald Schmidt, stated: "In this particular case, I consider the relevant market to be the market for DirecTV sales leads. Participants in this market on the seller side are people or entities who place advertisements and engage in marketing to produce sales leads (inquiries from potential DirecTV customers). Authorized DirecTV retailers, along with DirecTV itself, are the participants on the buyer side. DirecTV and its authorized retailers purchase such sales leads for the purpose of converting them into activations of DirecTV service."

Based on our review of pertinent case law, below, we conclude the trial court properly found that Schmidt failed to articulate a cognizable relevant market.

15

b. *Basic's proposed definition of the relevant market was deficient because it did not address interchangeability of DirecTV sales leads with other sales leads, or explain why DirecTV sales leads are not part of the larger market for sales leads.*

The law in this area is well settled. "Plaintiffs have the burden of defining the relevant market. [Citations.] 'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.' [Citations.] Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. See, e.g., *TV Communications Network, Inc. v. Turner Network Television, Inc*., 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp*., 956 F.Supp. 270 (E.D.N.Y.1996) ('Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.'); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162 (S.D.N.Y.1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition); *Re-Alco Industries, Inc. v. Nat'l Center for Health Educ., Inc*., 812 F.Supp. 387 (S.D.N.Y.1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); *E. & G. Gabriel v. Gabriel Bros., Inc*., No. 93 Civ. 0894, 1994 WL 369147 (S.D.N.Y.1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-

16

elasticity of demand)." (*Queen City Pizza, Inc. v. Domino's Pizza, Inc*. (3rd Cir. 1997) 124 F.3d 430, 436-437 (*Queen City*).)

Thus, for example, in *Exxon*, *supra*, 51 Cal.App.4th 1672, a suit brought by franchisee gasoline service station dealers against the franchisor, the relevant market was held to be *all* gasoline, not the wholesale market for Exxon brand gasoline. (*Id*. at p. 1682.) Although Exxon had a "*natural monopoly over its own product*," it lacked a dominating share of the petroleum market and was not in a position to monopolize or dominate that market. (*Id*. at p. 1677, italics added.)

That is not to say that "a single brand of a product can never be a relevant market." (*Exxon*, *supra*, 51 Cal.App.4th at p. 1685.) In *Eastman Kodak Co. v. Image Technical Services, Inc*. (1992) 504 U.S. 451 [119 L.Ed.2d 265] (*Kodak*), the Supreme Court observed that a market is defined with reference to reasonable interchangeability. (*Id*. at p. 482.) The Court held that the market for repair parts and services for Kodak photo-copiers was a valid relevant market because repair parts and services for Kodak machines *are not interchangeable* with the service and parts used to repair other copiers. (*Ibid*.) "The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies. When the copiers were first sold, Kodak relied on purchasers to obtain service from independent service providers. Later, it chose to use its power over the market in unique replacement parts to squeeze the independent service providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher cost. *Because this change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision*." (*Queen City*, *supra*, 124 F.3d at p. 440, italics added.)

*Kodak* is clearly distinguishable from the instant case. Here, by entering into the written agency agreements with DirecTV, Basic was duly advised that DirecTV had "sole and absolute discretion" with respect to Basic's use of any marketing tactic, channel or method, that Basic could be terminated with or without cause on 30 days' notice, that it

17

waived any right to compensation or damages in connection with termination (such as recoupment of advertising costs), and that it was prohibited from sharing compensation with any other retailers. Given these disclosures, Basic had the ability to weigh the contractual restrictions at the time it made the decision to become a retailer for DirecTV. Accordingly, *Kodak*'s concern that consumers were not informed at the time of purchase that they would be locked into Kodak's repair service is not implicated here.

Guided by these authorities, we conclude Basic's proposed single brand relevant market, consisting of the "market for DirecTV sales leads," was legally insufficient. Basic failed to show that DirecTV sales leads are unique and not interchangeable with other sales leads. There is no analysis to show why DirecTV sales leads are not part of the larger market for cable and satellite sales leads, or entertainment sales leads, or sales leads generally. Without a proper definition of the relevant market, there is no triable issue of material fact with respect to Basic's claim of a vertical restraint.

3. *Remaining issues not reached*.

Having determined that the trial court properly granted summary judgment in favor of DirecTV because Basic failed to raise a triable issue with respect to either a horizontal or vertical restraint, it is unnecessary to address Basic's contention that it suffered antitrust injury and has standing to bring a Cartwright Act claim.

It is also unnecessary to address Basic's contentions that the trial court erred with respect to its evidentiary rulings, which sustained DirecTV's objections to portions of the declarations of Ronald Schmidt and Shane Cannon.

The excluded portion of the Cannon declaration stated that after DirecTV implemented a policy which prohibited Cannon Satellite from placing new directory ads, Cannon Satellite continued to generate new activations from the ads it had previously placed. However, the relevant issue for our purposes is not whether Cannon Satellite continued to make sales from old directory ads, but whether Cannon Satellite had the ability to sell its sales leads to other retailers. The excluded portion of the Cannon declaration has no bearing on that question.

As for the excluded portion of the Schmidt declaration, it sought to address the economic conditions in the market for sales leads and the impact of the allegedly coerced agreement in suppressing competition in that market. Schmidt opined the depression of the price for sales leads created a disincentive for retailers to invest in marketing tactics to generate sales leads, and would lead to fewer activations and fewer new DirecTV customers in the long run. Although Schmidt opined regarding the impact of DirecTV's exercise of monopsony power in the relevant market, given Schmidt's failure to properly define a relevant market, as set forth above, this evidentiary ruling requires no discussion.

## DISPOSITION

The judgment is affirmed. DirecTV shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19